**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-6826**

THOMAS HEYER,

              Plaintiff - Appellant,

       and

ROBERT PAUL BOYD,

              Plaintiff,

       v.

UNITED STATES BUREAU OF PRISONS; THOMAS R. KANE, in his
official capacity as Acting Director of the United States
Bureau of Prisons; IKE EICHENLAUB, in his official capacity
as Regional Director of the United States Bureau of Prisons
Mid-Atlantic Region; WARDEN SARA M. REVELL; WARDEN TRACY W.
JOHNS; JEFFERSON B. SESSIONS, III, Attorney General,

              Defendants - Appellees.

--------------------------

NATIONAL ASSOCIATION OF THE DEAF,

              Amicus Supporting Appellant.

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh.  James C. Dever III,
Chief District Judge.  (5:11-ct-03118-D)

Argued:  October 26, 2016          Decided:  February 23, 2017

Before MOTZ, TRAXLER, and FLOYD, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Traxler wrote the opinion, in which Judge Motz and Judge Floyd joined.

**ARGUED:** Ian S. Hoffman, ARNOLD & PORTER LLP, Washington, D.C., for Appellant. Robert J. Dodson, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Deborah Golden, Elliot Mincberg, WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS & URBAN AFFAIRS, Washington, D.C.; David B. Bergman, ARNOLD & PORTER LLP, Washington, D.C., for Appellant. John Stuart Bruce, Acting United States Attorney, Jennifer P. May-Parker, Jennifer D. Dannels, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellees. Marc Charmatz, Howard A. Rosenblum, Debra Patkin, NATIONAL ASSOCIATION OF THE DEAF, Silver Spring, Maryland, for Amicus Curiae.

TRAXLER, Circuit Judge:

Appellant Thomas Heyer has been deaf since birth. His native language is American Sign Language ("ASL"), and he communicates primarily though ASL. Heyer is presently confined as a sexually dangerous person, see Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587, at the federal correctional institution in Butner, North Carolina. Heyer brought this action against the United States Bureau of Prisons and other defendants (collectively, "BOP"), raising various claims related to BOP's failure to provide ASL interpreters for medical appointments and other important interactions, its refusal to provide Heyer with access to a videophone, and its failure to otherwise accommodate his deafness. The district court granted summary judgment in favor of BOP, and Heyer appeals. As we will explain, we affirm the district court's dismissal of Count III, as Heyer does not challenge that ruling on appeal, but we vacate the remainder of the district court's order and remand for further proceedings.[1]

I.

A.

---

[1] Robert Boyd, another Adam Walsh detainee, was originally a plaintiff in this action. His appeal was dismissed after it was discovered that he was not deaf.

3

Heyer was previously convicted of possessing child pornography. In 2007, Heyer violated the terms of his supervised release and served the resulting eighteen-month sentence at Butner. Shortly before that sentence expired in December 2008, the government filed a petition seeking to detain Heyer under the Adam Walsh Act. Heyer has remained in civil custody at Butner since that filing. The district court held a hearing on the government's petition in May 2012 and ordered Heyer detained as a sexually dangerous person. We affirmed that order on appeal. See United States v. Heyer, 740 F.3d 284 (4th Cir. 2014).

Under the terms of the Adam Walsh Act, Heyer will remain in civil custody until such time as the government determines that his "condition is such that he is no longer sexually dangerous to others, or will not be sexually dangerous to others if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment." 18 U.S.C. § 4248(e). When making this determination, BOP's mental health professionals may consider, among other things, evidence "[e]stablished through interviewing and testing of the person"; evidence "[o]f the person's denial of or inability to appreciate the wrongfulness, harmfulness, or likely consequences of engaging or attempting to engage in sexually violent conduct or child molestation"; and evidence "[i]ndicating successful completion of, or failure to

4

successfully complete, a sex offender treatment program." 28 C.F.R. § 549.95.

Adam Walsh detainees at Butner are expected to participate in the "Commitment and Treatment Program" ("CT Program"). designed for Adam Walsh detainees. J.A. 305. The CT Program includes mental health treatment in group and individual settings, daily meetings, and other "contextual activities" that "maximize the opportunities for therapeutic gain." J.A. 536. Heyer began participating in the CT Program in July 2012.

B.

As noted, Heyer has been deaf since birth and communicates primarily through ASL. Heyer cannot read lips and has no ability to understand speech. Heyer, who has an eighth-grade education, has extremely limited proficiency in English. The lexicon and syntax structure of English and ASL are entirely different, and Heyer cannot communicate effectively in written English.[2]

Since arriving at Butner in December 2008, Heyer has made multiple requests for ASL interpreters. BOP officials refused

---

[2] Because this is an appeal from the grant of summary judgment, we recount the facts and the reasonable inferences to be drawn therefrom in the light most favorable to Heyer, the non-moving party. See Raub v. Campbell, 785 F.3d 876, 878 (4th Cir. 2015).

5

to provide qualified interpreters for any purpose until late 2012, more than a year after this case was commenced.

Heyer has high blood pressure and cholesterol, and he has had multiple seizures during his time at Butner. From 2008 until December 2012, however, BOP refused to provide Heyer with ASL interpreters for scheduled medical appointments or during medical emergencies. Because no ASL interpreter was present at medical appointments, Heyer has had difficulty understanding the instructions for taking and refilling his prescription medications. For example, in February 2011, Heyer went without his blood pressure medication because he did not understand the doctor's refill instructions. In November 2011, Heyer suffered a seizure while in his cell. Alerted to the problem by Heyer's cellmate, the officer on duty concluded that Heyer "looked fine," J.A. 36, and did not seek medical attention for Heyer. Heyer finally saw a doctor more than a month after the seizure, but no interpreter was provided for him.

In 2010, prison officials assigned another inmate to act as Heyer's "inmate companion person" to help Heyer communicate with others. Although the inmate companion does not know ASL,[3] BOP required Heyer to rely on him during medical interactions.

---

[3] When tested by Heyer's expert, the inmate companion could not even provide a "ratable sample of ASL," meaning that he (Continued)

As to the CT Program designed for Adam Walsh detainees, BOP officials concluded that Heyer's inmate companion would be "inadequate" to facilitate Heyer's participation. J.A. 1117. BOP nonetheless did not provide Heyer with ASL interpreters for the CT Program until September 2012; even then, interpreters were provided for only some portions of the Program.

In December 2012 -- eighteen months after the initiation of this action -- BOP announced that it would provide ASL interpreters for Heyer's scheduled medical appointments. Through October 2013, however, Heyer had at least nine medical interactions (whether scheduled appointments or emergencies) where no interpreter was provided, including at least two scheduled appointments. See J.A. 495, 1285.

At some point after the commencement of this action, BOP entered into a contract with a provider of video remote interpreting ("VRI") services, which provides Internet-based 24-hour, on-demand access to qualified ASL interpreters, for use in cases of medical emergencies or other urgent interpreting needs. In an affidavit dated August 21, 2014, a BOP official stated that VRI services would be available to Heyer "in the very near

---

could not provide "at least several minutes" of ASL use during a 20-minute proficiency assessment. J.A. 372.

7

future," assuming the provider and interpreters could meet BOP's background-check requirements.  J.A. 301.

C.

Heyer communicates with the outside world through email and through the use of a "TTY" device, which contains a keyboard and permits written messages to be sent between TTY devices over a telephone line.  TTY does not permit real-time conversations, and each conversation over a TTY device takes significantly longer than signed or spoken conversations.  Effective communication over a TTY device requires proficiency in written English, which Heyer lacks.  There are only two TTY devices at Butner, both of which are in locked staff offices.  Heyer thus can use the TTY device only with the assistance of a staff person, and only a few staff members are trained on its use. Staff members frequently deny Heyer access to the TTY during the day, and, because of staffing issues, he has essentially no ability to use it at night or on the weekends.  Inmates who are not deaf have free use of the telephone at Butner and do not need to seek staff permission.

TTY is old technology that is fast becoming obsolete.  Over the last decade, many deaf people have migrated from TTY devices to videophones.  Because a TTY device is required on both ends of the call, the abandonment of TTY technology means there are fewer and fewer people with whom Heyer can communicate.

8

A videophone works much like a telephone does for a hearing person.  As explained in the record, a videophone is a telephone operated through a computer or stand-alone device which has a camera and screen for visual, real-time communication.  If users on both ends of the conversation have a videophone, they can communicate directly and visually using ASL.  If one user does not have a videophone, the deaf person can use the videophone to access Video Relay Service ("VRS").  With VRS, the deaf person communicates visually with an operator, using ASL, and the operator interprets the conversation orally to the non-deaf party through a telephone.

Heyer's deafness has caused him other problems while at Butner.  For example, Heyer does not attend religious services because he cannot understand or participate without an interpreter.  Heyer cannot understand announcements made over the prison's public address system.  He cannot access goods sold through the commissary, because the goods are handed through a mirrored window by a person with whom Heyer cannot interact.  Heyer attends a GED preparation class, but his participation is very limited because no interpreter is provided.  Heyer has missed or been late for scheduled activities because BOP has refused to provide him with a vibrating watch or vibrating bed device.  Other inmates have had to alert Heyer to fire alarms because he cannot hear the alarm sounding through the prison.

9

In March 2014 -- almost three years after the commencement of this action -- BOP installed an emergency flashing light in his cell. However, the flashing strobe light is very similar to the periodic flashing of staff flashlights, which makes it difficult for Heyer to determine whether there is an emergency.

## II.

In 2011, Heyer brought this action against BOP. In the complaint, Heyer asserted that BOP violated the Rehabilitation Act of 1973 by failing to provide ASL translators and otherwise accommodate his disability. Heyer also asserted multiple violations of his Fifth Amendment rights, including claims based on BOP's failure to provide ASL interpreters for medical appointments and to permit him to participate in the CT Program and communicate with the mental health officials responsible for determining the duration of his civil commitment. Heyer also alleged violations of his First Amendment rights based on BOP's failure to provide access to a videophone and its restrictions on access to the TTY device (Count VIII). Finally, Heyer alleged violations of his rights under the First Amendment and the Religious Freedom Restoration Act of 1993 ("RFRA"), based on BOP's failure to provide ASL interpreters so Heyer can participate in religious services.

The district court dismissed the Rehabilitation Act claim (Count I) for failure to exhaust administrative remedies, and it

10

dismissed Heyer's Fifth Amendment right-to-privacy claim (Count V) for failure to state a claim. See Heyer v. United States Bureau of Prisons, 2013 WL 943406, at *3, (E.D.N.C. Mar. 11, 2013) (unpublished). The court thereafter granted summary judgment in favor of BOP on the remaining claims. The court dismissed one claim for lack of standing, rejected some claims on the merits, and rejected others as moot, based on BOP's post-litigation decision to begin providing ASL interpreters for certain purposes. See Heyer v. United States Bureau of Prisons, 2015 WL 1470877 (E.D.N.C. Mar. 31, 2015) (unpublished). Heyer now appeals the district court's 2015 summary judgment ruling[4]; he does not appeal the district court's 2013 dismissal of Counts I and V of his complaint.

"We review a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." T-Mobile Ne., LLC v. City Council of Newport News, 674 F.3d 380, 384–85 (4th Cir. 2012) (internal quotation marks omitted).

_____

[4] In Count III of the complaint, Heyer challenged BOP's failure to provide ASL interpreters for disciplinary proceedings. Because Heyer had never been subject to disciplinary proceedings at Butner, the district court in its 2015 order dismissed the claim, concluding that Heyer lacked standing to pursue it. Heyer does not challenge that dismissal on appeal.

11

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

                                III.

We begin with Heyer's claims that BOP's failure to provide ASL interpreters for medical interactions amounts to deliberate indifference to Heyer's medical needs. The deliberate-indifference standard comes from the Supreme Court's Eighth-Amendment jurisprudence applicable to prisoners convicted of a crime. "[T]he Eighth Amendment's prohibition against 'cruel and unusual punishments' [extends] to the treatment of prisoners by prison officials," Hill v. Crum, 727 F.3d 312, 317 (4th Cir. 2013), and "forbids the unnecessary and wanton infliction of pain," id. (internal quotation marks omitted). As the Supreme Court has explained, "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (citation and internal quotation marks omitted).

Although Heyer is a civil detainee rather than a convicted prisoner, Heyer nonetheless frames his argument in Eighth-Amendment terms, arguing that he is entitled under the Fifth Amendment to at least the same protection prisoners receive

12

under the Eighth Amendment.[5]  According to Heyer, the failure to provide interpreters amounts to deliberate indifference to his medical needs and thus violates his Fifth Amendment rights.  As we will explain, we agree with Heyer that his evidence is sufficient to support a finding of deliberate indifference and that the district court therefore erred by granting summary judgment in favor of BOP on these claims.[6]

The deliberate-indifference standard has two components. The plaintiff must show that he had serious medical needs, which

[5] See, e.g., Youngberg v. Romeo, 457 U.S. 307, 322, (1982) (Civil detainees "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."); Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977) ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."); Bell v. McAdory, 820 F.3d 880, 882 (7th Cir. 2016) ("States must treat detainees at least as well as prisoners, and often they must treat detainees better -- precisely because detainees (whether civil or pretrial criminal) have not been convicted and therefore must not be punished.").

[6] In cases involving involuntarily committed psychiatric patients, claims of inadequate medical care are governed by the "professional judgment" standard rather than the deliberate indifference standard.  See Youngberg, 457 U.S. at 323; Patten v. Nichols, 274 F.3d 829, 838 (4th Cir. 2001).  Because we agree with Heyer that his evidence is sufficient to support a finding of deliberate indifference, we need not flesh out the differences between the two standards or determine whether the professional-judgment standard should also be applied to civil detainees who are confined alongside convicted criminals in a correctional facility rather than in a psychiatric hospital. See Brown v. Harris, 240 F.3d 383, 388 (4th Cir. 2001) (concluding that deliberate-indifference standard applies to medical-care claims involving pre-trial detainees).

13

is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry.  See Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

A.

In our view, Heyer's evidence is more than sufficient to show the existence of serious medical needs.  A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Id. at 241 (internal quotation marks omitted).

As we understand his claims, Heyer does not contend that his deafness, in and of itself, is a serious medical need that requires treatment.  Instead, he contends that BOP's failure to provide ASL interpreters for his medical interactions has led to constitutionally inadequate treatment for serious medical needs that have arisen during his confinement.  We agree.

As discussed above, Heyer has suffered multiple seizures during his confinement, and we have little difficulty concluding that seizures are sufficiently serious to require medical treatment.  See Shreve v. Franklin Cty., 743 F.3d 126, 135 (6th Cir. 2014) (explaining that seizure suffered by inmate amounted to "a serious medical need to which indifference would likely have been a constitutional violation in itself"); cf. Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) (no evidence of

14

objectively serious medical need in case where detainee was not "hav[ing] trouble breathing . . . [,] was not bleeding, was not vomiting or choking, and was not having a seizure"). And while suffering these serious medical problems, Heyer was completely unable to communicate with medical staff. Heyer's evidence establishes, for purposes of these proceedings, that he can only communicate through ASL. He cannot read lips, has no ability to understand speech, and cannot communicate effectively in written English. Thus, without an ASL interpreter, Heyer was unable to explain what happened or describe his symptoms to the medical staff, and he was unable to understand any questions or instructions from the medical staff. Even a lay person could easily recognize the need for a patient with a serious medical condition to be able to communicate with medical staff, so a proper diagnosis can be made, and for the patient to understand the medical staff's instructions, so the medical condition can be properly treated.

BOP does not argue that seizures are not serious, nor does it contend that the ability to communicate with medical providers is unimportant to treatment. Instead, BOP, mirroring the district court's analysis, argues that Heyer cannot show a serious medical need because there is no evidence that Heyer suffered any "adverse medical condition as a result of not being

15

provided interpreters during his medical encounters." Brief of Appellee at 44.

We disagree. BOP's argument demands more of Heyer than the case law requires. An actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a "substantial <u>risk</u> of serious harm." <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994) (emphasis added); see also <u>Rish v. Johnson</u>, 131 F.3d 1092, 1096 (4th Cir. 1997) (deliberate-indifference standard requires prisoner to "produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions, or <u>demonstrate a substantial risk of such serious harm</u> resulting from the prisoner's unwilling exposure to the challenged conditions" (citation omitted; emphasis added)); <u>Ball v. LeBlanc</u>, 792 F.3d 584, 593 (5th Cir. 2015) ("To prove unconstitutional prison conditions, inmates need not show that death or serious injury has already occurred. They need only show that there is a substantial risk of serious harm." (citation and internal quotation marks omitted)).

In our view, the facts outlined above are sufficient to show that the absence of ASL interpreters during medical interactions exposed Heyer to a substantial risk of serious harm. Heyer's evidence is thus sufficient, at this stage of the

16

proceedings, to satisfy the objective component of the deliberate-indifference inquiry.

B.

We turn now to the subjective component of the inquiry – whether BOP acted with deliberate indifference.

"Deliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (internal quotation marks and alterations omitted). A prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to [the inmate's] health or safety." Farmer, 511 U.S. at 837. "Put differently, the plaintiff must show that the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and drew that inference." Scinto, 841 F.3d at 225 (internal quotation marks and alterations omitted).

The district court rejected Heyer's medical-care claims on the first prong of the standard, and the court therefore did not address whether Heyer's evidence was sufficient to establish deliberate indifference. BOP argues, however, that Heyer's evidence is insufficient. In BOP's view, Heyer presented no evidence showing that BOP officials "knew that by not providing Heyer an interpreter during his medical evaluations, . . . he

17

was unable to communicate with medical staff to the extent there existed a substantial risk of serious harm to his health." Brief of Appellee at 51. BOP notes that it provided Heyer with an inmate interpreter to facilitate Heyer's communication, and it contends there is no evidence showing it knew that communicating through the inmate companion was insufficient. Again, we disagree.

BOP has been aware of Heyer's deafness since he arrived at Butner in 2008, and the record establishes that Heyer made multiple requests for ASL interpreters and repeatedly informed prison officials of his inability to understand. Indeed, the fact that BOP assigned Heyer an inmate companion is itself some evidence that BOP knew that Heyer could not effectively communicate on his own.

Contrary to BOP's argument, the decision to provide Heyer with the inmate companion does not insulate it from a finding of deliberate indifference. As we have made clear, the mere fact that prison officials provide some treatment does not mean they have provided "constitutionally adequate treatment." De'lonta v. Johnson, 708 F.3d 520, 526 (4th Cir. 2013). While "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." Id. (footnote omitted).

18

In our view, Heyer's summary-judgment evidence is more than sufficient to support a finding that BOP knew that communication through the inmate companion was inadequate. As noted above, the inmate companion assigned to Heyer did not know ASL. The inappropriateness of using an interpreter who did not speak Heyer's language is obvious, and that very obviousness could support a factfinder's conclusion that BOP knew the inmate companion was inadequate. See Farmer, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." (citation omitted; emphasis added)).

Moreover, Heyer's evidence shows that BOP officials did in fact know that the communication through the inmate companion was inadequate. Dr. Andres Hernandez, BOP's psychologist in charge of Heyer's treatment, refused to permit the use of the inmate companion "in the formal provision of [CT Program] treatment services." J.A. 1276. As Dr. Hernandez explained in his deposition, he found the inmate companion to be "inadequate to conduct treatment," J.A. 1117, and believed qualified interpreters were "imperative" to "insure that there was accurate, reliable understanding," so as to "maintain the

19

adequacy of treatment, the effectiveness of treatment." J.A. 1117; see also J.A. 1123 (Hernandez "cannot meaningfully communicate with Mr. Heyer without interpreters"); J.A. 1294 (affidavit of another psychologist involved in Heyer's treatment stating that "the use of qualified ASL interpreters is necessary in general for Heyer to progress through the [CT Program]").

This evidence shows BOP's knowledge of all the factual premises underpinning Heyer's deliberate-indifference claim: BOP knew that Heyer was deaf and needed ASL interpreters to communicate; BOP knew that "accurate" and "reliable" communication was necessary for Heyer's treatment to be effective; and BOP knew that the inmate companion was "inadequate" to ensure understanding. While Dr. Hernandez may have been speaking specifically to Heyer's psychiatric treatment, his views about the inadequacy of the inmate companion are equally applicable to the treatment of his physical health issues. From this evidence, a factfinder could reasonably conclude that BOP was deliberately indifferent, as it knew that its failure to provide ASL interpreters during Heyer's medical interactions created a substantial risk of serious harm to his health. See Farmer, 511 U.S. at 837 (A prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety."); Scinto, 841 F.3d at 226 (explaining that "a prison official's failure to

20

respond to an inmate's known medical needs raises an inference of deliberate indifference to those needs" (internal quotation marks and alterations omitted)).

## C.

Accordingly, for the reasons outlined above, we conclude that Heyer's evidence, when accepted as true, is sufficient to satisfy the objective and subjective components of the deliberate-indifference inquiry. The district court therefore erred by granting summary judgment in favor of BOP on Heyer's claim that BOP failed to provide him with constitutionally adequate medical care.

## IV.

We turn now to Heyer's First Amendment claims. Heyer contends that, despite his confinement, he retains a First Amendment right to communicate with those outside the prison. And given the evidence establishing his inability to communicate in written English, Heyer argues that BOP's failure to provide him with access to a videophone improperly restricts his First Amendment rights under the four-factor analysis set out by the Supreme Court in Turner v. Safley, 482 U.S. 78 (1987). In the alternative, Heyer argues that, even if BOP's reliance on the TTY device were adequate, BOP has failed to provide reasonable access to the TTY device.

## A.

21

Courts have generally concluded that the First Amendment rights retained by convicted prisoners include the right to communicate with others beyond the prison walls. See, e.g., Yang v. Missouri Dep't of Corr., 833 F.3d 890, 894 (8th Cir. 2016) (The rights retained by a convicted prisoner "include the right to communicate with persons outside the prison walls, subject to regulation that protects legitimate governmental interests."); Pope v. Hightower, 101 F.3d 1382, 1385 (11th Cir. 1996) (concluding that convicted prisoners retain a "First Amendment right to communicate with family and friends"); Washington v. Reno, 35 F.3d 1093, 1100 (6th Cir. 1994) (recognizing that "persons incarcerated in penal institutions retain their First Amendment rights to communicate with family and friends"); Morgan v. LaVallee, 526 F.2d 221, 225 (2d Cir. 1975) ("A prison inmate's rights to communicate with family and friends are essentially First Amendment rights subject to § 1983 protection . . . ."). As a civil detainee rather than a convicted prisoner, Heyer's First Amendment rights are at least as broad as those retained by convicted prisoners.

BOP does not dispute that Heyer retains rights under the First Amendment that are implicated by the challenged policies. Indeed, it explicitly agrees that "[t]he First Amendment protects an inmate's right to communicate with family and friends." Brief of Appellee at 15. Instead, BOP contends that

22

its refusal to provide Heyer with his communication method of choice -- a videophone -- did not infringe his First Amendment rights, such that there is no occasion to apply the Turner factors. BOP alternatively argues that if application of the Turner factors is required in this case, its refusal to provide a videophone is nonetheless proper.

B.

In Turner v. Safley, the Supreme Court concluded that a prison policy or regulation that "impinges on inmates' constitutional rights . . . is valid if it is reasonably related to legitimate penological interests," 482 U.S. at 89, and the Court identified four factors to consider when determining the reasonableness of the policy, id. at 89-91. Accordingly, as BOP argues, consideration of the Turner reasonableness factors is required only if the prison policy "impinges" on Heyer's First Amendment rights.

BOP contends that the record shows that Heyer can communicate with those outside the prison through use of the TTY device, and that Heyer's First Amendment rights are therefore satisfied by the access BOP provides to the TTY. BOP thus argues that its TTY policy does not impinge on Heyer's First Amendment rights, and that Heyer's demand for a better way to communicate is not a viable constitutional claim. We disagree.

23

BOP's argument that Heyer can effectively communicate through the TTY device is based on a highly selective reading of the record. As previously discussed, the TTY device utilizes a keyboard and permits the transmission of written messages between TTY users; effective communication over a TTY device therefore requires proficiency in written English. Heyer's evidence, however, establishes that he has extremely limited proficiency in English and cannot communicate effectively in written English.[7] While BOP points to evidence suggesting that Heyer might sometimes, under certain circumstances, be able to communicate effectively through writing,[8] that evidence is not entitled to the dispositive effect that BOP assigns to it. The procedural posture of this case requires us to view the evidence in the light most favorable to Heyer, which means that we must

---

[7] See Expert Report, J.A. 350 ("Heyer . . . cannot communicate effectively in written English."); id., J.A. 372 (Heyer's "proficiency in English (speech, lip-reading and reading and writing) is severely limited); id., J.A. 355 ("American Sign Language is structurally different from English," and its "lexicon and syntactic structure [are] quite unlike that of spoken English"); Heyer Deposition, J.A. 267 ("I will write a note and, usually the person that's reading it does not understand what I've written because I write in ASL and their language is English."); id. ("My sentences are not in English, so they do not understand what I'm saying.").

[8] For example, Heyer's expert suggested that written communication might possibly be effective for Heyer if it involved "short routine, frequently repeated written communications." J.A. 378. In addition, Heyer testified in his deposition that his brother could understand his emails. J.A. 296.

24

accept as true the evidence showing that Heyer cannot communicate effectively through written English and therefore cannot communicate effectively through the TTY device. And because the evidence establishes that Heyer cannot communicate effectively through the only means that BOP makes available to him, we cannot accept BOP's assertion that its TTY-only policy does not impinge on Heyer's First Amendment right to communicate with those outside the prison.

C.

Given our conclusion that BOP's policy impinges on Heyer's First Amendment rights, we must determine whether that policy "is reasonably related to legitimate penological interests," as required by Turner. 482 U.S. at 89. As explained in Turner, the reasonableness of the policy depends on (1) whether a "valid, rational connection [exists] between the prison regulation and the legitimate governmental interest put forward to justify it," (2) whether "alternative means of exercising the right [exist] that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether there was an

25

"absence of ready alternatives" to the regulation in question. Id. at 89-90 (internal quotation marks omitted).[9]

                                    1.

We first consider whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." Id. at 89 (internal quotation marks omitted). "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." Id. at 89-90.

BOP contends that its TTY-only policy furthers its legitimate interest in maintaining prison security. According to BOP, videophones create security issues not presented by the TTY system, such as the possibility of a video recording of the

---

[9] The Supreme Court in Turner v. Safley was considering whether a prison policy improperly restricted the First Amendment rights of a convicted prisoner rather than a civil detainee. See 482 U.S. 78, 81-84 (1987). Some courts have made modifications to the Turner factors to reflect the differences between convicted prisoners and detainees. See, e.g., Brown v. Phillips, 801 F.3d 849, 853 (7th Cir. 2015) (concluding that in case involving civil detainee, Turner requires that challenged policy "must be rationally connected to the state's interests -- here, security and the rehabilitation and treatment of sexually violent persons"). Because Heyer does not suggest that any such adjustments should be made in this case and we conclude that his claims are viable under the Turner factors as originally formulated, we need not decide whether adjustments should generally be made in cases involving civil detainees.

26

conversation being posted on the Internet. In addition, BOP contends that

> [w]ith video communications, it is more difficult to prevent sexually illicit acts from occurring, or controlling who or what the inmate can see on the other end of the video monitor (i.e., children or prior victims). Such calls would likely require attentive and continuous live monitoring, and even if staff did observe sexually inappropriate conduct over the video monitor, the act may be committed before the staff member has an opportunity to terminate the call (e.g., indecent exposure to child).

Brief of Appellee at 21-22 (citation omitted).

BOP also argues that it has a legitimate interest in monitoring all inmate communication and that its TTY-only policy is rationally related to that interest. BOP currently monitors inmate telephone calls through the secure BOP Inmate Telephone System, and BOP contends that the system cannot accommodate a videophone "without the development and funding of a separate and secure Information Technology infrastructure." Brief of Appellee at 21.

There is no doubt that BOP has a legitimate interest in maintaining the security of its facilities and in protecting the public from further criminal acts by inmates and detainees. Nonetheless, there are reasons that a factfinder might question the legitimacy of the particular security risks asserted in this case.

27

As to BOP's insistence that videophone conversations must go through its secure Inmate Telephone System, we note that the TTY system currently in place operates on an <u>unsecured</u> line in a private staff office. Given BOP's current willingness to let Heyer place TTY calls through an unsecured line unconnected to the Inmate Telephone System, a factfinder could question BOP's sudden insistence that videophone calls be part of the System.

And while BOP argues that maintaining the security of videophone conversations would require "attentive and continuous live monitoring," Brief of Appellee at 21, the current TTY system <u>already requires</u> continuous staff monitoring. The TTY device is in a private office with a computer and other staff equipment, and a prison official is always present during Heyer's use of the TTY device. Because the monitoring of a videophone conversation would be no more demanding of staff time than the monitoring of the TTY conversations that is already being done, the factfinder could question whether a videophone system would in fact present the difficulties asserted by BOP.

Nonetheless, we recognize that a videophone conversation presents certain risks not present with TTY conversations, such as the possibility of a video of the conversation being posted on the Internet or the possibility that an inmate might expose himself to the person on the other end of the conversation. A ban on videophones prevents these situations from occurring, and

thus the ban bears at least some connection to BOP's legitimate interest in maintaining security and protecting the public. As we will explain, however, questions of fact arise under the other Turner factors as to the reasonableness of BOP's videophone ban. See Jehovah v. Clarke, 798 F.3d 169, 178-79 (4th Cir. 2015) (reversing grant of summary judgment under Turner even though challenged policy bore some connection to the penological interests asserted by the defendants).

2.

The second Turner factor requires us to consider whether Heyer has alternate means of exercising the constitutional right. "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." Turner, 482 U.S. at 90 (citation, internal quotation marks, and alteration omitted). BOP contends that alternate means of communicating with those outside Butner are available to Heyer -- specifically, TTY, email, written letters, and in-person visits. Because other means of communication remain available to Heyer, BOP contends the ban on videophones is reasonable. We disagree.

With the exception of in-person visitation, all of the alternate means of communication identified by BOP involve the

29

use of written English.  As we have already explained, however, the record contains evidence establishing that Heyer's proficiency with English is severely limited and that he cannot effectively communicate in written English.  Although Heyer presumably would be able to communicate through ASL with those who visit him at Butner, the availability of in-person visitation is of little help in emergencies or other situations where there is a need for immediate contact.  Accordingly, we believe that Heyer's evidence, which must be accepted as true, would permit a factfinder to conclude that no other effective means of communication are available to Heyer.

3.

The third factor we must consider under Turner is the effect that "accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally."  Id. at 90.  "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials."  Id.

BOP contends the effect of accommodating Heyer's request would be significant.  BOP claims it would be required to "develop and fund a separate and secure IT infrastructure in order to monitor and record each videophone call on an agency-

30

wide basis," Brief of Appellee at 24 (emphasis added), and that it would cost nearly $2 million to install videophones at all of its 119 institutions. Moreover, monitoring the substance of a videophone conversation would require the services of an ASL interpreter, which further increases the costs to BOP.

Again, however, Heyer's evidence precludes us from concluding that the effect of accommodating Heyer's needs would be so great that the videophone ban is reasonable as a matter of law. As previously noted, the TTY device currently used by Heyer operates through an unsecured telephone line that is not part of the Inmate Telephone System, and BOP is apparently satisfied that the risks associated with the use of unsecured line are manageable. This evidence thus creates questions of fact about BOP's assertion that a videophone would require creation of a new, secure IT infrastructure.

BOP also insists that any accommodation should be implemented on what would be a very expensive, system-wide basis. However, nothing in the record indicates why a system-wide solution would be required, and Heyer's evidence shows that a videophone could be installed in Butner (presumably using the same unsecured line used by the TTY device) at de minimis

31

expense to the government.[10]    And while the videophone conversations would require live monitoring by prison staff, that should not be a significant additional burden, as prison staff already monitor Heyer's TTY calls.

In light of this evidence, a factfinder could conclude that accommodating Heyer's needs would have minimal effect on guards or other inmates or on the prison's allocation of resources, thus raising questions about the reasonableness of the videophone ban.

4.

Finally, Turner requires us to consider whether there are "ready alternatives" to the challenged policy.  Turner, 482 U.S. at 90.  As the Court explained, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." Id. (internal quotation marks omitted).  Although the Court cautioned lower courts not to treat this factor as the equivalent of the "least restrictive alternative test," the Court held that "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may

---

[10] Heyer's evidence indicates that BOP could obtain the necessary equipment and software for "no cost or modest cost." J.A. 663.  Even under BOP's estimate, establishing a stand-alone videophone system at Butner would cost no more than $2500.

32

consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id. at 90-91 (internal quotation marks omitted). In this case, there is significant evidence of ready alternatives to BOP's ban on videophones.

As Heyer notes, the regular inmate telephone system presents security risks -- for example, inmates can use the phone to direct or commit crimes, and the call recipient can record and post the call on the Internet. Those risks, however, have not driven BOP to ban telephones; instead, it handles individual problems as they arise, suspending usage rights for offending inmates and taking other appropriate action. Nothing in the record suggests that the security risks posed by videophones are so qualitatively different that they can only be managed by banning videophones. Indeed, the record shows that many of the security risks associated with a videophone could be minimized by simply setting it up in a secure office, as the TTY device is. Access to the videophone could be restricted to deaf inmates, and any abuses of the system could be handled on a case-by-case basis, as they are with the inmate phone system.

Moreover, Heyer's evidence establishes that videophones are in many ways more secure than TTY devices. The TTY device requires the user to have physical access to the equipment, while the equipment for a videophone system -- which is little more than a camera connected to a desktop computer -- can be set

33

up in a way that the detainee has no access to it.  Basic software packages permit videophones to be password-protected to prohibit unauthorized access; TTY devices are not password-protected.  Moreover, videophone conversations can be digitally recorded, encrypted, and stored electronically.  By contrast, the record of TTY conversations is printed out by the device itself, thus making it possible for an inmate to grab the print-out and destroy the record of his conversation.

Given Heyer's evidence of the minimal cost of a videophone and the ease with which security concerns could be mitigated, we believe that a factfinder could reasonably conclude that BOP's refusal to provide a videophone is an exaggerated response to the perceived security concerns.  The district court therefore erred by granting summary judgment to BOP on Heyer's First Amendment videophone claim.  See Jehovah, 798 F.3d at 179 (reversing grant of summary judgment because jury could find prisoner's proposed alternatives to be so "obvious and easy" as to show that total ban on wine was an "exaggerated response" (internal quotation marks omitted)).

D.

Independent of his videophone claim, Heyer also claims that BOP violated his First Amendment rights by unreasonably restricting his access to the TTY device.  The district court summarily rejected that claim, concluding that Heyer had proved

34

"at most isolated instances of being unable to use the TTY immediately upon [his] request." J.A. 145. We agree with Heyer that the record precludes a grant of summary judgment on this claim.

Heyer filed a verified complaint, which is the "the equivalent of an opposing affidavit for summary judgment purposes." World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co., 783 F.3d 507, 516 (4th Cir. 2015) (internal quotation marks omitted). In his complaint, he states that access to the TTY is "regularly restricted or denied," J.A. 40, and that prison staff "consistently den[ies him] access altogether without justification," J.A. 41. If the few trained staff members "are away for training or on vacation," Heyer is "unable to access the TTY at all." J.A. 41. In his deposition, Heyer confirmed the difficulties in getting access to the TTY, with it sometimes taking days before access is granted, and staff sometimes failing to follow up on the request at all. Heyer also testified that he has never been able to use the TTY on nights or weekends.

While we do not suggest that the Constitution requires deaf inmates to have precisely the same access to TTY devices other inmates have to telephones, we believe that this evidence, accepted as true, shows a sufficiently serious interference with Heyer's rights to communicate beyond Butner's walls to support a

35

First Amendment claim. Cf. Washington, 35 F.3d at 1100 ("[A] prisoner's right to telephone access is subject to rational limitations in the face of legitimate security interests of the penal institution." (internal quotation marks omitted)).

As to the Turner factors, we believe questions of fact preclude the grant of summary judgment. Heyer alleges in his complaint that access to the TTY was often denied without justification, and a factfinder could certainly conclude that arbitrary interference with a detainee's exercise of his constitutional rights is not "reasonably related" to any "legitimate penological interests." Turner, 482 U.S. at 89; cf. Benzel v. Grammer, 869 F.2d 1105, 1108 (8th Cir. 1989) ("Although in some instances prison inmates may have a right to use the telephone for communication with relatives and friends, prison officials may restrict that right in a reasonable manner . . . ."). Moreover, the record establishes the availability of ready alternatives to BOP's current inconsistent and inadequate approach to access, including the largely cost-free option of training more staff members on the use of the TTY, so as to give Heyer more access to the TTY on nights and weekends. Because there are questions of fact on issues relevant to the application of the Turner factors, we conclude that the district court erred by granting summary judgment against Heyer's claim that he was unreasonably denied access to the TTY device.

The district court rejected Heyer's remaining claims by focusing on, at least in part, BOP's post-litigation conduct and assertions that it would provide the relief Heyer was seeking. See J.A. 137 (rejecting Fifth Amendment claim (Count II) based on failure to provide ASL interpreters for the mental health treatment provided through the CT Program because BOP stated that it would provide interpreter services for future individual therapy sessions); J.A. 143-44 (dismissing Fifth Amendment claim (Count VII) based on BOP's failure to provide visual alarms and other items necessary to alert Heyer to emergencies because BOP's post-litigation safety improvements were sufficient); J.A. 145-46 (dismissing as moot Heyer's RFRA and First Amendment claims (Counts IX and X) based on BOP's failure to provide interpreters for religious services because BOP stated that it would begin providing interpreters for religious services on request). Heyer argues on appeal that the district court erred by relying on BOP's voluntary, post-litigation actions to reject his claims. We agree.

A.

The district court dismissed Counts IX and X as moot based on BOP's stated intent to provide the requested relief in the future. The court explained that BOP's voluntary cessation of the challenged action mooted the claims because BOP

37

"unequivocally state[s] that [Heyer] will be provided, upon request, with a qualified interpreter for religious ceremonies and programs," such that "there is no reasonable expectation that the alleged violation will recur and [BOP's] solution will completely and irrevocably eradicate any burden the lack of interpreters formerly placed on [Heyer's] exercise of religion." J.A. 146 (internal quotation marks omitted).

"It is well established that a defendant's voluntary cessation of a challenged practice moots an action only if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Wall v. Wade, 741 F.3d 492, 497 (4th Cir. 2014) (internal quotation marks omitted). "[W]hen a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claims should not be dismissed as moot." Id. BOP bears the "heavy burden" of showing that "the challenged conduct cannot reasonably be expected to start up again." Id. (internal quotation marks omitted). "[B]ald assertions of a defendant -- whether governmental or private -- that it will not resume a challenged policy fail to satisfy any burden of showing that a claim is moot." Id. at 498.

When dismissing these counts, the district court relied on BOP's assurance of interpreters contained in a 2014 affidavit from a BOP chaplain which states that "BOP will provide . . .

38

inmates with a qualified interpreter . . . if necessary for effective communication during religious ceremonies or programs." J.A. 343. BOP contends this assurance is sufficient to support the district court's ruling because BOP has "no policy or practice . . . that prevents deaf inmates from receiving interpreters for the purpose of attending religious programming." Brief of Appellee at 60. Thus, in BOP's view, the chaplain's assurance that interpreters would be provided is simply a "recommit[ment] to a preexisting practice of providing interpreters." Id. at 61. We disagree.

Regardless of whether BOP has previously provided interpreters for other deaf inmates, the record here establishes (for summary-judgment purposes) that BOP has not provided Heyer with interpreters for religious services. See J.A. 403, 408. Accordingly, given our standard of review and BOP's burden of proof, the chaplain's affidavit cannot be viewed as a statement of current policy, but must instead be understood as a mid-litigation change of course. Viewed through that lens, the chaplain's statement does not support the district court's decision to dismiss these claims as moot. Even if we ignore the equivocation inherent in the promise to provide interpreters "if necessary," the statement amounts to little more than a "bald assertion[]" of future compliance, which is insufficient to meet BOP's burden. Wall, 741 F.3d at 498.

39

Moreover, as previously discussed, BOP in 2012 announced that it would provide ASL interpreters for Heyer's scheduled medical appointments. Since that time, however, Heyer has had at least two scheduled medical appointments where no interpreter was provided. Because the record establishes that BOP has already failed to live up to its promises regarding the provision of ASL interpreters, the record does not require us to conclude that "the challenged conduct cannot reasonably be expected to start up again." Id. at 497 (internal quotation marks omitted). Under these circumstances, the district court erred by concluding that BOP's assertion that it would begin providing interpreters rendered Counts IX and X moot.

B.

In Count VII, Heyer challenged BOP's failure to provide visual alarms and other items, such as pagers, vibrating beds, or vibrating watches, necessary to alert Heyer to emergencies. After noting in its factual summary that BOP in 2014 (almost three years after the commencement of this action) had installed a strobe light in the cell to which Heyer was assigned, see J.A. 128, the district court granted summary judgment against the claim because Heyer was "seek[ing] more safety measures than those [BOP has] implemented rather than arguing that [BOP has] failed to provide [him] with any safety measures at all." J.A. 143.

40

Although BOP did recently install a strobe light in Heyer's cell, the mere fact that BOP has taken some action does not mean that the action is constitutionally sufficient. See, e.g., De'lonta, 708 F.3d at 526. Indeed, Heyer presented evidence showing that the strobe light was inadequate to alert him to emergencies, see J.A. 496, but the district court nonetheless appears to have assumed that the strobe light was an adequate response to Heyer's safety needs. Moreover, BOP cannot guarantee that Heyer will always be assigned to one of the four cells where the strobe lights were installed,[11] and Heyer has presented evidence challenging the adequacy of the prison's other existing mechanisms for ensuring Heyer's awareness of emergencies. Under these circumstances, the district court erred by granting summary judgment in favor of BOP on Count VII.

C.

In Count II, Heyer asserted a Fifth Amendment claim based on BOP's failure to provide ASL interpreters for the mental-health treatment provided through the CT Program. The district court assumed that Heyer had a protected liberty interest in

---

[11] In an affidavit filed with BOP's summary-judgment materials, the manager of the prison unit where Heyer is assigned stated that Heyer would remain in one of the four cells "[a]bsent any exigent circumstances." J.A. 216. Butner's warden, however, stated in his deposition that regular rotation of inmates to different cells is a "good correctional practice" that he would not rule out implementing in the future. J.A. 707.

41

receiving the treatment. The court nonetheless granted summary judgment against the claim, observing that BOP had agreed to provide ASL interpreters for Heyer's participation in most aspects of the CT Program and concluding that the denial of interpreters for the first few months after Heyer began participating in the CT Program did not amount to a cognizable constitutional injury. See J.A. 137.

Even if we accept the district court's conclusion that BOP's initial failure to provide interpreters is not significant enough, on its own, to establish a constitutional violation, Heyer's claim is not concerned with seeking damages for past constitutional wrongs. Instead, Heyer seeks a court ruling that, because the length of his confinement is dependent in large part on BOP's assessment of his mental health, BOP is constitutionally obliged to provide interpreters for all aspects of the mental-health treatment it offers to Adam Walsh detainees, and he also seeks an injunction ordering BOP to provide the necessary interpreters. BOP's post-litigation decision to provide interpreters for some aspects of Heyer's treatment clearly provides no basis for rejecting Heyer's claim on the merits. Accordingly, we conclude that the district court erred by granting summary judgment in favor of BOP on Count II.

42

## VI.

To summarize, we conclude that Heyer has presented sufficient evidence to preclude summary judgment in favor of BOP on Heyer's medical-treatment claims (Counts IV and VI), safe-environment claim (Count VII), and videophone- and TTY-related First Amendment claims (Count VIII). We therefore vacate the district court's order granting summary judgment in favor of BOP as to those claims, and we remand those claims for trial.

As to Counts II, IX, and X, we conclude that the district court erred by giving dispositive effect to BOP's post-litigation assurances that it would provide the ASL interpreters Heyer requested. We therefore vacate the district court's order granting summary judgment in favor of BOP on Count II and dismissing Counts IX and X as moot. On remand, the district court may re-evaluate the merits of these claims in light of the evidence presented by the parties, but the court may not give dispositive effect to BOP's assurances that qualified interpreters will be provided.

Finally, because Heyer does not challenge it on appeal, we affirm the district court's dismissal of Count III.

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED

43