Sean F. Cox, United States District Judge
In this class action, named Plaintiffs Mary McBride and Ralph Williams represent a class of deaf or hard of hearing individuals in the custody of the Michigan Department of Corrections who require hearing-related accommodations for various reasons. They have filed suit against the MDOC and various agency administrators and prison wardens, asserting violations *698 of the American Disabilities Act, 42 U.S.C. § 12101, et seq. ; the Rehabilitation Act, 29 U.S.C. § 794, et seq. ; The Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, et seq. ; and the Free Exercise and Free Speech Clauses of the First and Fourteenth Amendment. They seek only declaratory and injunctive relief to remedy these alleged violations.
The Court referred this matter to Magistrate Judge David R. Grand for a report and recommendation under 28 U.S.C. § 636(b)(1)(B) (Doc. # 37), after which the parties filed cross-motions for summary judgment (Doc. # 74, 76).
On February 8, 2018, Magistrate Judge Grand issued a Report and Recommendation (R & R) (Doc. # 96) wherein he recommends that the Court grant in part and deny in part Plaintiffs' Motion for Summary Judgment and deny Defendants' Motion for Summary Judgment. Defendants timely objected to the R & R on February 22, 2018 (Doc. # 97). Plaintiffs have not objected to the R & R and the time for them to do so has passed.
For the reasons below, the Court finds Defendants' objections to be without merit. Thus, the Court shall overrule the objections and adopt the R & R.
STANDARD OF REVIEW
Pursuant to Fed. R. Civ. P. 72(b), a party objecting to the recommended disposition of a matter by a Magistrate Judge must filed objections to the R & R within fourteen days after being served with a copy of the R & R. The objecting party must do more than merely restate the arguments set forth in its summary judgment motion. Senneff v. Colvin, 2017 WL 710651 at * 2 (E.D. Mich 2017). "The district judge to whom the case is assigned shall make a de novodetermination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made." Fed. R. Civ. P. 72(b)(3).
ANALYSIS
Defendants raise three objections to the R & R: (1) that questions of fact exist as to whether prisoners housed within the MDOC have been denied meaningful access to telecommunications devices; (2) the Magistrate Judge improperly applied an optimal accommodation standard instead of a reasonable accommodation standard when assessing their purported denial of interpreter services for essential programs; and (3) the Magistrate Judge improperly recommended that a formal training be required in a Consent Judgment. The Court shall address each in turn.
Objection 1: Meaningful Access to Telecommunications Devices
Defendants' first objection pertains to Plaintiffs' ADA and Rehabilitation Act claims that the "MDOC has failed to take the necessary steps to ensure that deaf and hard of hearing prisoners' communications are as effective asthose of hearing prisoners, and to provide appropriate auxiliary aids to permit communication and participation on an equal basis." Doc. # 76 at 23. On this claim, Magistrate Judge Grand concluded that the MDOC's existing practices fail to provide Plaintiffs "with telecommunications access equal to that provided to hearing prisoners." R & R at 20. Thus, he determined that Plaintiffs are entitled to summary judgment on this aspect of their ADA and Rehabilitation Acts claims.
Defendants object that there is at least a question of fact as to whether Plaintiffs' rights have been violated. Their reasoning is two-fold; they contend that Magistrate Judge Grand erred by failing to accord them the deference due to a correctional facility's safety judgments, see *699 Bell v. Wolfish, 441 U.S. 520, 546, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and that he impermissibly required them to provide optimal, rather than reasonable, accommodations. The Court finds neither of these arguments, both of which were raised and considered by the Magistrate Judge, persuasive.
First, Magistrate Jude Grand did give Defendants the required deference. He expressly recognized the "substantial deference" due to Defendants, seeBrown v. Johnson, 743 F.2d 408, 410 (6th Cir. 1984), and considered and addressed their safety and control concerns. Defendants cannot create a question of fact merely by referring to possible safety concerns. And the Court agrees with Magistrate Judge Grand's analysis and conclusion that the safety concerns articulated by Defendants do not preclude summary judgment. Indeed, even in their objections Defendants have still failed to explain why the safety policies applied to telephone conversations "would not be as effective at addressing risks associated with video transmissions." R & R at 19.
Second, the Magistrate Judge's report did not shift the standard as Defendants claim. To "reasonably accommodate" individuals with disabilities, public entities like the MDOC must "take appropriate steps to ensure that communications with applicants, participants, and members of the public, and companions with disabilities are as effectiveas communications with others." 28 C.F.R. § 35.160(a)(1) (emphasis added). After carefully examining the record, Magistrate Judge Grand found that the MDOC's existing system-providing prisoners with access to teletypewriters-fails to provide reasonableaccommodations. He did not, as Defendants assert, require optimal accommodations to be provided. Indeed, one of Defendants' own witnesses likened the MDOC's existing system to "sending someone a fax to their homes versus an email to communicate." R & R at 13 n. 5. Again, the Court agrees with the Magistrate Judge's analysis and conclusion that "Plaintiffs have shown that, in reality, [teletypewriters] do not enable them to communicate effectively with persons outside of prison, much less provide them with telecommunications access equal to that of hearing prisoners. Thus, the Court shall overrule Defendants' first objection.
Objection 2: Denial of Interpreter Services for Essential Programs
The second objection relates to "whether the MDOC provides deaf and hard of hearing inmates with access to sign language interpreters that enables them to communicate and participate in programs and activities inside the prison to the same extent as hearing prisoners." R & R at 21. Magistrate Judge Grand concluded that Plaintiffs are entitled to summary judgment on this aspect of their ADA and Rehabilitation Act claims as well, finding that absent appropriate injunctive relief, the MDOC's deaf and hard of hearing inmates face a real risk of not timely receiving necessary accommodations. R & R at 25.
Defendants' objection to this portion of the R & R is brief; they again argue that the Magistrate Judge erred by applying an optimal accommodation standard. This is not so. The MDOC is required to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities ... an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1). And although the Magistrate Judge did not find that there has been a systemic denial of interpreting services, he did find that the evidence shows both that Defendants have continued to fail to furnish appropriate auxiliary aids by way of an interpreter and *700 that there is a tangible risk that this failure will continue to occur. This finding supported Magistrate Judge Grand's ultimate conclusion: that Defendants' accommodations were not reasonable. The Court agrees with the Magistrate Judge's analysis on this issue, which did not employ an optimal accommodation standard. Thus, the Court shall overrule Defendants' second objection.
Objection 3: Recommendation to Include a Reasonable Training Provision
Finally, while denying Plaintiffs' summary judgment on their claim relating to the MDOC's training practices, Magistrate Judge Grand stated that it would nevertheless "be an appropriate exercise of the Court's remedial powers and discretion to include in any Consent Order a provision requiring MDOC correctional officers and staff to receive some form of reasonable training on how to identify and appropriately interact with deaf and hard of hearing prisoners." R & R at 32-33. Defendants cursorily object to this recommendation, stating only that it is improper.
Having reviewed the R & R, the Court agrees with Magistrate Judge Grand that including a training provision in any consent order would be an appropriate discretionary exercise of the Court's remedial powers. Indeed, the R & R details the MDOC's history of failing to adequately respond to the needs of deaf and hard of hearing prisoners and its continuing failure to address the issues that Plaintiffs have raised. See e.g., R & R at 26 ("[D]espite the prior problems, and the pendency of this litigation, the MDOC has not taken any steps to monitor or verify whether its facilities are complying with the McKee Memo's directives."). And because the Court shall grant Plaintiffs' Motion for Summary Judgment in part, the MDOC will likely be faced with implementing new policies or procedures to ensure ADA compliance. Under the circumstances, the Court agrees with the Magistrate Judge that a reasonable training requirement is appropriate. Thus, the Court shall overrule Defendants' third objection.
CONCLUSION
For the reasons above, the Court OVERRULES Defendants' objections and ADOPTS the Magistrate Judge's February 8, 2018 Report and Recommendation. IT IS ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. # 76) shall be GRANTED IN PART AND DENIED IN PART and that Defendant's Motion for Summary Judgment (Doc. # 74) shall be DENIED. Specifically, the Court GRANTS Plaintiff's Motion for Summary Judgment as to Counts I and II of the complaint and denies their motion as to the remaining counts.
IT IS FURTHER ORDERED THAT:
1) The MDOC shall:
a) Make videophones available to all deaf and hard of hearing prisoners;
b) Provide necessary auxiliary aids for all deaf and hard of hearing prisoners to participate equally in prison programs and services, including consistent access to ASL interpreters for all "high-stakes" interactions and programs, seeR & R at 21, including religious services;
c) Institute mandatory training for MDOC's correctional officers and staff on how to identify and appropriately interact with deaf and hard of hearing prisoners;
d) Adopt effective and comprehensive policies and procedures in each of the above areas, including for appropriate compliance monitoring;
2) The parties shall meet and confer in an attempt to resolve any aspects of Plaintiffs' claims not disposed of by this *701 order, and to agree on an appropriate consent order implementing the relief specified in Paragraph 1 above, and any other relief necessary to bring this action to a close.
3) Within 60 days of this order, the parties shall either file a proposed consent order for the Court's review and approval or file a joint status report regarding any outstanding issues preventing the parties from agreeing on a consent order.
IT IS SO ORDERED.
REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [76] AND TO DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [74]
DAVID R. GRAND, United States Magistrate Judge
In this class action, the Court has certified the following class of Plaintiffs: "all deaf and hard of hearing individuals in the custody of the [Michigan Department of Corrections (the "MDOC") ] (whether now or in the future), who require hearing-related accommodations, including but not limited to interpreters, hearing devices, or other auxiliary aids or services, to communicate effectively and/or to access or participate in programs, services, or activities available to individuals in the custody of the MDOC." (Doc. # 95). Defendants are the MDOC and several agency administrators and prison wardens who are sued in their official capacities (collectively, the "Defendants"). Plaintiffs allege that the MDOC has denied them, and will continue to deny them, the hearing accommodations they need to effectively communicate with prison staff and others, participate in MDOC programs, services, and activities, and follow safety warnings and directives, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq. ; the Rehabilitation Act, 29 U.S.C. § 794 et seq. ; the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc et seq. ; and the First and Fourteenth Amendments of the United States Constitution. Plaintiffs seek only declaratory and injunctive relief to remedy these alleged violations of their rights. More specifically, Plaintiffs seek, inter alia , a Court Order (1) declaring that the Defendants have violated the foregoing laws, and (2) enjoining Defendants from "refusing to provide the proper interpretive services, TDD, videophones, and other hearing devices that are required for deaf and hard of hearing inmates to fully participate in and benefit from the programs offered by [the MDOC and its facilities], and required to ensure their physical safety." (Doc. # 1 at 49).
The parties have filed cross-motions for summary judgment that have been referred to the undersigned for a Report and Recommendation; Plaintiffs moved for summary judgment with respect to their claims under the ADA and the Rehabilitation Act (Doc. # 76), and the Defendants moved for summary judgment as to all of Plaintiffs' claims (Doc. # 74). The motions are fully briefed, and the Court heard oral argument on June 13, 2017.
For the reasons discussed below, IT IS RECOMMENDED that Plaintiffs' motion for summary judgment (Doc. # 76) be GRANTED IN PART AND DENIED IN PART and Defendants' motion for summary judgment (Doc. # 74) be DENIED.
I. FACTUAL BACKGROUND[1]
Two named plaintiffs, Mary McBride *702 ("McBride") and Ralph Williams[2] ("Williams"), represent the class of "all deaf and hard of hearing individuals in the custody of the MDOC (whether now or in the future), who require hearing-related accommodations, including but not limited to interpreters, hearing devices, or other auxiliary aids or services, to communicate effectively and/or to access or participate in programs, services, or activities available to individuals in the custody of the MDOC." (Doc. # 95). MDOC is a Michigan state agency that receives federal funds for a variety of programs. It is undisputed that when McBride and Williams commenced this action in March 2015, the MDOC did not have statewide policies for identifying and classifying deaf and hard of hearing prisoners, ensuring they were housed at (or transferred to) facilities properly designated to house them, or ensuring that their specific communication needs were being consistently and properly accommodated. (PX E[3] at 7-8, 11; PX F at 6, 10-11, 17; PX G at 7-8, 11; PX H at 11, 14; PX K at 19, 29; DX 6).
It is also undisputed, however, that since the filing of this action, the MDOC has taken certain steps to address these clear deficiencies. For instance, the MDOC created "Guidelines for Hearing Impaired Accommodations and Classification" pursuant to which new prisoners are evaluated for hearing impairment and then "classified" based on their level of impairment: "N"-hearing impaired without deficit; "H" hearing impaired with deficit, with the classifications being based on the degree of hearing loss in one or both ears. (DX 6 at ¶¶ 3-4; PX I). Prisoners whose hearing needs can be met by the use of a hearing aid are classified "HA". (Id. ). While Plaintiffs "welcome" the MDOC's changes, they contend that those changes "still fall well short of what is required under the law ..." (Doc. # 76 at 10). Defendants, on the other hand, assert that the MDOC is now *703 "providing meaningful access[4] to all programs and services for its hearing impaired population rendering the relief sought in this matter moot." (Doc. # 74 at 26).
The parties' arguments focus on three general topics: (1) Telecommunications Services and Auxiliary Aids (i.e. , certified sign language interpreters); (2) Notification of Prison Warnings and Announcements; and (3) Training Related to Treatment and Accommodation of Deaf and Hard of Hearing Prisoners. Below the Court addresses the evidence marshalled by each side as to these areas and concludes that, at least as to the first one, Plaintiffs are entitled to summary judgment, and that Defendants' summary judgment motion lacks merit.
II. LEGAL STANDARDS
Federal Rule of Civil Procedure 56 instructs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Marshall v. The Rawlings Co. LLC , 854 F.3d 368, 381 (6th Cir. 2017) (quoting Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ). In determining whether the evidence presents a disputed issue for trial, the evidence must be viewed in the light most favorable to the nonmoving party. Gillis v. Miller , 845 F.3d 677, 683 (6th Cir. 2017) (citation omitted). And where both parties seek summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." McKay v. Federspiel , 823 F.3d 862, 866 (6th Cir. 2016) (quoting Taft Broad. Co. v. United States , 929 F.2d 240, 248 (6th Cir. 1991) ).
The initial burden rests with the moving party to demonstrate that no genuine issue of material fact exists. Savage v. Fed. Express Corp. , 856 F.3d 440, 446 (6th Cir. 2017) (citing Celotex Corp. v. Catrett , 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ). Once the moving party clears this threshold hurdle, the opposing party must specifically identify "significant probative evidence" in the record upon which a reasonable jury could find in its favor to survive summary judgment. Miller v. Maddox , 866 F.3d 386, 389 (6th Cir. 2017) (citation omitted). The court is not required to search the record to determine whether genuine issues of material fact exist. Street v. J.C. Bradford & Co. , 886 F.2d 1472, 1479-80 (6th Cir. 1989) ; see also Bormuth v. Cty. of Jackson , 870 F.3d 494, 499-500 (6th Cir. 2017) (noting that the nonmoving party "has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact").
The party bearing the burden of proof faces a "substantially higher hurdle" to obtain summary judgment. E.g. , Arnett v. Myers , 281 F.3d 552, 561 (6th Cir. 2002).
*704 While the party free of a trial burden needs only show that the opponent cannot sustain its burden to prevail on summary judgment, a movant which bears the burden of persuasion must convince the court that "no reasonable trier of fact could find other than for the moving party." Epperson v. Res. Healthcare of Am., Inc. , 566 Fed.Appx. 433, 438 (6th Cir. 2014) (citing Calderone v. United States , 799 F.2d 254, 259 (6th Cir. 1986) ).
III. ANALYSIS
Title II of the ADA & Section 504 of the Rehabilitation Act
The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "to provide clear, strong, consistent, enforceable standards addressing discrimination against" such individuals. 42 U.S.C. § 12101(b)(1)-(2). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act applies the same prohibition to any program or activity receiving federal funds: "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).
Other than Section 504's limitation to denials of benefits "solely" by reasons of disability and its applicability only to entities that receive federal funds, "the reach and requirements of both statutes are precisely the same." S.S. v. E. Kentucky , 532 F.3d 445, 452-53 (6th Cir. 2008) ; see also Babcock v. Michigan , 812 F.3d 531, 540 (6th Cir. 2016) (explaining that "analysis of Rehabilitation Act claims roughly parallels ADA claims because the statutes contain similar language and are quite similar in purpose and scope") (internal quotation marks omitted). When, as is the case here, neither of these differences are at issue, Title II and Section 504 claims are addressed together. Id. (citing Thompson v. Williamson County , 219 F.3d 555, 557 n.3 (6th Cir. 2000) ); see also C.R. v. Novi Cmty. Sch. Dist. , No. 14-14531, 2017 WL 528264 at *15 (E.D. Mich. Feb. 9, 2017). Accordingly, the Court will discuss the Plaintiffs' claims in the context of the ADA.
Under Title II's implementing regulations, "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of a disability." 28 C.F.R. § 35.130(b)(7). With respect to hearing disabilities specifically, public entities must "take appropriate steps to ensure that communications with ... participants ... with disabilities are as effective as communications with others," id. § 35.160(a)(1), and to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities ... an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity," id. § 35.160(b)(1). In order to be "effective" in the relevant sense, "auxiliary aids and services must be provided in accessible formats [and] in a timely manner." Id. § 35.160(b)(2).
A. Claims and Issues on which Plaintiffs Seek Summary Judgment
i. Identification, Classification and Placement of Deaf and Hard of Hearing Prisoners
In their summary judgment motion, Plaintiffs provide a detailed "overview" of *705 the MDOC's "Identification and Classification of Deaf and Hard of Hearing Prisoners." (Doc. # 76 at 12-14). While Plaintiffs criticize the manner in which the MDOC identifies and places deaf and hard of hearing prisoners, they did not separately argue for the entry of summary judgment on this basis. Rather, Plaintiffs argued for summary judgment based on the MDOC's alleged failure to provide accommodations for telecommunications services and auxiliary aids, notification of prison warnings and announcements, and training issues. (Doc. # 76 at 22-30). However, at the conclusion of their "Argument" section, Plaintiffs wrote:
Any one of MDOC's failures to appropriately accommodate Plaintiffs is sufficient to grant summary judgment for Plaintiffs. So too is MDOC's admission that there are numerous deaf and hard of hearing prisoners housed at facilities not designated to house them, and thus likely lacking even the limited accommodations available at designated facilities. SMF ¶¶ 10-11, 23; Clarkson [v. Coughlin , 898 F.Supp. 1019, 1050-51 (S.D.NY. 1995) ] (placing certain deaf and hard of hearing prisoners at facilities not designated for accommodations, even for "disciplinary, safety and/or medical reasons," renders the prison system's "accommodations conditional and is therefore violative of the ADA").
(Doc. # 76 at 30) (emphasis added).
While Clarkson does appear to support Plaintiffs' position, summary judgment on the MDOC's classification and placement of deaf and hard of hearing prisoners is not appropriate at this time. In addition to failing to properly argue the issue in their motion, at least on the record presently before the Court, factual questions exist about how and when the MDOC places such inmates at particular facilities.
As noted supra at 701-02, it is undisputed that when Plaintiffs commenced this action, the MDOC did not have statewide policies for identifying and classifying deaf and hard of hearing prisoners, or ensuring they were housed at (or transferred to) facilities properly designated to house them. In early 2016, however, the MDOC created "Guidelines for Hearing Impaired Accommodations and Classification." (DX 6 at ¶ 3; PX I). The parties do not seem to dispute that new prisoners are being evaluated and classified pursuant to these Guidelines. The only real issue the Plaintiffs raise in their "overview" is a contention that even with these Guidelines, there were, at the time they filed their summary judgment motion, at least some deaf and hard of hearing inmates who were not housed at one of the MDOC's six designated facilities. Initially, the Plaintiffs asserted that the "MDOC's current list of deaf and hard of hearing prisoners indicates that 84 of the 200 deaf and hard of hearing prisoners in its custody (42%) continue to be housed at non-designated facilities-including 32 of the 82 prisoners with the most severe hearing loss classification (39%)." (Doc. # 76 at 13). Although they did not address the issue further in their reply brief, Plaintiffs noted in their response to Defendants' summary judgment motion that a different "MDOC list" shows "only five individuals with the most severe designation are so housed." (Doc. # 83 at 15 n.6). The MDOC presented other evidence indicating that "[i]n May of 2016, all prisoners-with the exception of five-who had been classified with an "H" designation were transferred to one of the six designated facilities." (Doc. # 74 at 12; DX 6 at ¶ 6). The MDOC also presented evidence that these five prisoners had not been transferred yet "due to programming needs" that could not be met at one of the six designated facilities, and that these prisoners are scheduled to be transferred *706 upon completion of this programming. (Id. at ¶ 7; DX 9 at 3-8).
In light of the foregoing, questions exist as to the number of affected prisoners, their "programming needs," and why those needs cannot be met at one of the six designated facilities. Accordingly, at least on the present record, summary judgment is not appropriate as to the MDOC's identification, classification and placement of deaf and hard of hearing inmates.
ii. Telecommunications Services and Auxiliary Aides
Plaintiffs make a much stronger factual showing that the MDOC continues to violate the ADA with respect to the telecommunications services and auxiliary aides it does and does not provide to deaf and hard of hearing inmates. Plaintiffs argue that the "MDOC has failed to take the necessary steps to ensure that deaf and hard of hearing prisoners' communications are as effective as those of hearing prisoners, and to provide appropriate auxiliary aids to permit communication and participation on an equal basis." (Doc. # 76 at 23).
Plaintiffs' desire for equally effective means of communication is not just an aspiration-it is the law. Regulations promulgated under the ADA explain that in order to "reasonably accommodate" individuals with disabilities, public entities like the MDOC must "take appropriate steps to ensure that communications with applicants, participants, and members of the public, and companions with disabilities are as effective as communications with others" and must "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities ... an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R §§ 35.160(a), (b)(1). The regulations also provide that, "[i]n order to be effective," these "auxiliary aids and services must be provided in accessible formats [and] in a timely manner." Id. § 35.160(b)(2). Finally, public entities must "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by, people with disabilities." 28 C.F.R. § 35.150.
The parties dispute whether Plaintiffs can effectively communicate without using video-based communication devices, and whether they have been denied meaningful access to sign language interpreters and other auxiliary aids. Both issues are addressed in turn.
a. TTYs versus Video-Based Communication
The MDOC provides deaf and hard of hearing prisoners with access to teletypewriters, or "TTYs" to meet their communication needs, but not video-based communication equipment, such as videophones and video relay service ("VRS"). (PX M at 9-10, PX T at 19-21). Plaintiffs not only argue that they cannot communicate effectively without such video-based communication tools, they factually established the point.
This aspect of Plaintiffs' motion is supported in large part by expert reports authored by Richard Ray and Dr. Dennis Cokely. (PXs P and Q). Ray was born with severe hearing loss and, as an adult, became completely deaf. (PX P at 7). In 2000, he received a Disability Rights Masters Certificate from Loyola Law School in Los Angeles, California. (Id. ). For the past 23 years, Ray has been employed by the City of Los Angeles Department on Disability to assess, monitor, and ensure the city's compliance with the ADA, Rehabilitation Act, and other federal, state and local disability laws. (Id. at 5). Presently he is Los Angeles' ADA Technology Access Coordinator, and before that, he was its Deputy ADA Compliance Officer and ADA Compliance Officer. (Id. at 5-6). Ray's expert *707 reports documents his wealth of experience and recognition as an expert in the field.
Dr. Cokely is a Professor of American Sign Language ("ASL") and Modern Languages at Northeastern University. (PX Q at 5). He also serves as the Director of the American Sign Language Program, and has served two terms as President of the Registry of Interpreters for the Deaf. (Id. ). Dr. Cokely has published numerous textbooks on ASL, and is the Principal Investigator for a $3 million grant from the U.S. Department of Education to establish a National Interpreter Education Center at Northeastern University. (Id. ). Prior to joining Northeastern, Dr. Cokely worked for twelve years as he President and co-owner of Sign Media, Inc., a video-production company that specialized in print and video material focused on the deaf community in the United States. (Id. ).
As relevant here, both Ray and Dr. Cokely opine that the MDOC's systemic failure to provide deaf and hard of hearing inmates with appropriate video-based communication tools such as videophones and VRS denies them the ability to effectively communicate. (PX P at 8-9, 13; PX Q at 7).
Ray provided the following uncontroverted description of TTYs and the two types of video-based technologies in issue, videophones and VRS:
TTY is a 60-year-old technology that enables remote communications between deaf individuals and between deaf and hearing individuals. In a conversation between two deaf individuals, both parties type and read responses using the teletypewriter device, and their typed conversation is transmitted back and forth across the standard telephone network. In a conversation between a deaf individual and a hearing individual, the deaf party uses the TTY while the hearing party uses a standard telephone. An operator then dictates the deaf individual's typed messages to the hearing party and types the hearing individual's spoken messages to the deaf party. To utilize a TTY a deaf individual must have access to a teletypewriter device. Thus, in order for a deaf individual to communicate with another deaf individual, both individuals must have a TTY.
* * *
Videophones are telephones with a high-definition video display, capable of simultaneous two-way interactive video and audio for communication between people in realtime using separate internal high-speed bandwidth Internet telecommunication services.
* * *
VRS uses high-speed internet to enable remote communications between deaf and hearing individuals. The deaf individual signs to an intermediary sign language interpreter via video monitor. The interpreter, in turn, relays the deaf person's message to the hearing individual in spoken English and vice versa. In a VRS conversation, the hearing party speaks into a standard telephone as he or she normally would. VRS has been widely available in the U.S. since at least the mid-2000s.
(PX P at 11, 14-16).
Thus, video-based communication allows deaf and hard of hearing individuals to communicate both with other deaf and hard of hearing individuals using ASL (through videophones) and with hearing individuals through VRS. Far more than simply being available technology, Plaintiffs presented ample evidence that TTYs are not a practical or effective communication tool for deaf and hard of hearing persons, and that video-based communication is today's standard mode of remote communication for such persons who communicate through sign language. (PX P at *708 14-17; PX Q at 49-52; PX R at 5). For example, Dr. Cokely explained:
There are several limitations to TTYs, however. One limitation is that this direct point-to-point TTY communication requires that both parties have TTYs. Although TTYs and free, federally mandated TTY relay services have, in the past, provided a significant level of communication access for [deaf] and hard of hearing people, the fact is that TTY technology has essentially become obsolete for reasons discussed below. Because TTYs are obsolete, it is increasingly unlikely that those with whom MDOC [deaf] and hard of hearing inmates wish to communicate will even own TTYs.[5] Also because a TTY conversation is typed, TTY conversations always take more time than if the conversation had been spoken or signed.
... TTY does not provide MDOC [deaf] and hard of hearing inmates with effective communication with those outside MDOC. In order to use a TTY effectively, the user must be proficient in written English and, as described above, many [deaf] and hard of hearing inmates do not communicate effectively in English.
* * *
During the past 10 to 15 years, Deaf people have eagerly and quickly replaced TTYs with Videophones [ ] for two very understandable reasons. First, TTYs require communication in typed English (the second language for most [deaf] and hard of hearing people and a language in which, as noted above, they rarely attain any significant level of fluency). Second, because TTY conversations are typed, those conversations take significantly longer and thus when [deaf] or hard of hearing people use TTYs they tend to keep conversations very brief (e.g. to make arrangements to meet in person).
[Videophones] by contrast, enable [deaf] and hard of hearing people to communicate using American Sign Language, a language in which they are much more comfortable and fluent. Thus their [videophone] conversations are not encumbered by written English nor slowed by having to type. Signed [videophone] conversations are analogous to spoken telephone conversations.
If each party has a VP then they can communicate directly; however, if only one party has a VP then communication with the party who does not have a VP is only possible using a free Video Relay Service (VRS), which utilizes the same hardware/software as the VP. Either party can initiate communication by connecting with a VRS provider and a VRS interpreter will facilitate the call, communicating via VP with the d/Deaf or hard of hearing caller and via voice with the non-deaf caller. If calling someone who does not have a VP, d/Deaf and hard of hearing inmates could use the VP to call a VRS center where a qualified ASL interpreter would answer. The [deaf] or hard of hearing inmate would then provide the phone number he or she wishes to call, and the ASL interpreter would place the call. The [deaf] or hard of hearing inmate would sign to the interpreter who would then interpret *709 into spoken English for the non-deaf person on the other end of the phone line, and also interpret that person's spoken English into ASL for the [deaf] or hard of hearing inmate.[6]
(PX Q at 49-51).
Dr. Cokely thus concluded, "MDOC must provide access to [videophones] for [deaf] or hard of hearing inmates and access to Video Relay Service (VRS)[7] providers in order for them to have telephone services and benefits that are equivalent to those afforded non-deaf inmates." (Id. at 52). Ray offered a similar analysis and opinion as to why the MDOC's provision of TTYs does not enable deaf and hard of hearing prisoners to communicate effectively with persons outside the prison:
TTYs offer limited effectiveness compared to sign language translation and the other auxiliary aids and services. Most fundamentally, a TTY's capacity to facilitate communication is completely dependent on deaf users' often limited reading and writing skills. In addition, most deaf individuals no longer use TTY devices (relying instead on videophones) and, as a result, deaf inmates who can only access TTYs are often unable to contact deaf friends and family members with the device. According to an FCC report, TTY use has declined by 10% per year. Of all operator-assisted calls involving deaf individuals, the FCC estimates that today only 12% are TTY calls. The majority (75%) are video-based calls.
Whereas an average typing rate is 40 words per minute and a professional typist can type as many as 80-100 words per minute, in the U.S. most TTYs use a communication code that is limited to transmitting text over telephone lines between the rate 30 to 60 words per minute.... Consequently, a TTY conversation takes much longer than a signed conversation...
* * *
For all of the above reasons, MDOC's provision of limited TTY access to deaf and hard-of-hearing inmates fails to provide them with the means to effectively communicate with deaf, hard-of-hearing, and hearing individuals outside the correctional center. MDOC needs to replace or supplement these TTY devices with the video-based services [ ] to provide deaf and hard-of-hearing inmates with remote communications technology comparable to that used by their hearing peers.
(PX P at 11, 13).
Defendants presented no expert evidence to rebut the opinions offered by Dr. Cokely and Ray, or any of the factual assertions on which those opinions rest. Instead, Defendants argue principally, *710 "While Cokely and Ray state that videophones offer better communication than TTY telephones, they do not refute that TTY telephones provide meaningful access , which is the standard." (Doc. # 85 at 8) (emphasis in original). Both aspects of this argument are flawed. First, one cannot reasonably interpret Dr. Cokely and Ray to be asserting that videophones are merely a "better" alternative to TTYs. Rather, Plaintiffs' experts clearly opine that video technology is necessary to enable deaf and hard of hearing prisoners to communicate effectively with persons outside of prison. Moreover, this aspect of Defendants' argument ignores that under the ADA, "[i]n determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of individuals with disabilities." 28 C.F.R. § 25.160(b)(2). Second, Plaintiffs' experts clearly refute that TTYs provide "meaningful access"; indeed, the very gist of their lengthy, detailed expert reports is that TTYs "fail[ ] to provide [deaf and hard of hearing prisoners] with the means to effectively communicate with ... individuals outside the correctional center." (PX P at 13) (emphasis added).[8] Defendants' evidence that TTYs "function" and are available to MDOC prisoners (DX 24 at 18; DRX 2 at 4), fails to address any of the evidence which shows that the machines' mere functionality does not equate with "meaningful access."
Defendants' other arguments in opposition to Plaintiffs' motion lack merit. They argue that "the Department of Justice's 2011 regulations specifically reference text telephones or TTYs as reasonable accommodations to be provided to individuals who are deaf or hard of hearing ..." (Doc. # 85 at 10). Here, Defendants are referring to 28 C.F.R. § 35.161, which provides, in relevant part, "[w]here a public entity[9] communicates by telephone with applicants and beneficiaries, [TTYs] or equally effective telecommunications systems shall be used to communicate with individuals who are deaf or hard of hearing." 28 C.F.R. § 35.161(a). But, this regulation was promulgated in 1991, when videophone technology would have been nonexistent or, at best, nascent. 28 C.F.R. § 35.161 (1992). More recently, in November 2015, the Federal Communications Commission issued a Report and Order which "strongly encouraged" prisons to provide deaf and hard of hearing inmates with such technologies:
We reaffirm our existing policy of strongly encouraging correctional facilities to provide inmates with communication disabilities with access to TTYs, as well as equipment used for advanced forms of TRS, such as videophones ... In addition, we strongly encourage correctional facilities to comply with obligations that may exist under other federal laws, including Title II of the ADA, which require the provision of services *711 to inmates with disabilities that are as effective as those provided to other inmates. Access to more advanced forms of TRS, including VRS ... may be necessary to ensure equally effective telephone services for these inmates. We recognize that some facilities have already begun providing access to alternative forms of TRS, often as the result of litigation brought under these other statutes. We strongly encourage other facilities to continue this trend voluntarily, without the need for further litigation.
Rates for Interstate Inmate Calling Services, 80 FR 79136-01, 2015 WL 9195269 (Dec. 18, 2015).
Most fundamentally, the question before the Court is whether TTYs actually provide deaf and hard of hearing inmates with an effective means of communication today. The fact that TTYs may have been recommended as an industry standard more than a quarter century ago, or even at some point in the less-distant past, helps very little in answering that question. It certainly fails to raise a material question of fact as to the validity of the evidence proffered by Plaintiffs that TTYs do not provide today's deaf and hard of hearing inmates with an effective means of communicating with persons outside of prison.
Next Defendants argue that summary judgment in Plaintiffs' favor is not warranted because the MDOC "is in the process of implementing a [VRS] on a trial basis." (Doc. # 85 at 10-11). This argument lacks merit for a few reasons. First, the statement is too vague to establish that any wrong has been remedied or will not recur in the future. Second, Plaintiffs have shown that a VRS-only solution will not address the needs of deaf inmates who wish to communicate with other deaf inmates because, as explained by Ray, VRS is a tool for communication between a deaf person and a hearing person in which an interpreter "relays the deaf person's [signed] message to the hearing individual in spoken English and vice versa. In a VRS conversation, the hearing party speaks into a standard telephone as he or she normally would." (PX P at 15-16).
Defendants' final argument against providing video telecommunications technology for deaf and hard of hearing inmates is about safety and control, both inside and outside the prison:
It is impossible to monitor, in real time, every telephone conversation. If that conversation is taking place via a videophone, the prisoner and the individual the prisoner is communicating with are doing so through an unfiltered video channel. In such a circumstance, it is possible that innocent victims could be put at risk. For instance, a child who may very well have been the victim of the prisoner's crime could be in the room with a family member when he or she is communicating with the prisoner.... Or someone communicating with a prisoner via videophone could display prohibited explicit sexual images or pornography to the prisoner or engage in sexual activity for the prisoner.
(Doc. # 85 at 8-9).
Safety and control are very legitimate concerns for the Defendants to raise. The Sixth Circuit has stated that, in general, "because the daily operation of a correctional facility poses difficult and unique management problems, prison official should be accorded substantial deference in the adoption and implementation of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Brown v. Johnson , 743 F.2d 408, 410 (6th Cir. 1984) (internal quotations omitted). However, even giving due consideration to Defendants' concerns, they have *712 not shown a material question of fact that would prevent the Court from granting summary judgment in Plaintiffs' favor on this issue.
First, the types of concerns expressed by Defendants are not limited to the video technology at issue here. Just as a child victim could be visible to a prisoner communicating over a video transmission, the outside participant could put the inmate on speakerphone in the child's presence, or pass a receiver to the child. Similarly, in a traditional telephone call, the outside participant could engage in sexually explicit conversation with the inmate. The MDOC admits that it "is impossible to monitor, in real time , every telephone conversation"[10] (Doc. # 85 at 8) (emphasis added), and its response to risks associated with telephone calls has not been to deny inmates access to telephones, but to adopt a formal policy (1) expressly prohibiting calls with victims and calls that are "harass[ing]," "unwelcome," or "obscene," and (2) mandating that all telephone calls be "monitored," with at least 50 such calls or recordings actually listened to or reviewed by assigned staff. (PX BBBB). Defendants have not explained why the same policies would not be as effective at addressing risks associated with video transmissions.
The only affirmative evidence Defendants cite in support of their position is the affidavit of Paul Slagter, who avers that "In the past, the MDOC allowed prisoners to send and receive 30 second pre-recorded video messages (video-grams) as a pilot program. This pilot was ended 60 days early when examples of this behavior was realized, resulting in the cessation of the video-gram program." (DRX 3). While this does speak to the potential for concern, it still fails to raise a material question of fact for two reasons. First, as noted above, the MDOC has failed to explain why its policy for monitoring telephone calls would not be equally effective in addressing video transmissions. Second, there is no indication that the situation alluded to by Slagter involved any deaf and hard of hearing inmates, whereas a video communication pilot program the MDOC implemented for that population did not result in any significant issues. Indeed, in a December 19, 2016 memo from Slagter to Kenneth T. McKee, the MDOC's Deputy Director, he wrote, "[two facilities using VRS have] realized very few prisoners attempting to misuse[11] VRS equipment ... There are some security concerns that will need to be addressed prior to a program of this nature being implemented. However, it is the opinion of this committee that these risks can be mitigated through operational controls." (PX S, at 5). Plaintiffs' expert Ray similarly explained numerous ways in which monitoring of video-based communications can be accomplished, none of which the Defendants rebutted. (PX P, at 17-19. In short, the Defendants failed to raise a material question of fact about safety concerns that would prevent the Court from entering summary judgment to Plaintiffs.
All of the foregoing firmly establishes that merely providing deaf and hard of hearing inmates with TTYs does not satisfy *713 the MDOC's obligations under the ADA because, even if TTYs could, in theory , provide a means of communication for deaf and hard of hearing prisoners, Plaintiffs have shown that, in reality , TTYs do not enable them to communicate effectively with persons outside of prison, much less provide them with telecommunications access equal to that provided to hearing prisoners. Accordingly, Plaintiffs are entitled to summary judgment on this aspect of their ADA and Rehabilitation Act claims.
b. Auxiliary Aids
Another issue in this case is whether the MDOC provides deaf and hard of hearing inmates with access to sign language interpreters that enables them to communicate and participate in programs and activities inside the prison to the same extent as hearing prisoners. While this question could arise in innumerable contexts inside the prison setting, Plaintiffs focus on their need for ASL interpreters in what they label "high-stakes" interactions and programs, including, "unexpected medical emergencies, hospital visits, psychological evaluations, offender treatment programs, disciplinary/investigative proceedings, religious activities, and educational courses and evaluations." (Doc. # 76 at 33) (citing PX Q at 8). Specifically, Plaintiffs assert that the "MDOC does not provide sufficient access to auxiliary aids for deaf and hard of hearing prisoners to communicate and participate in programs and activities inside the prison on an equal basis with hearing prisoners" and that "sign language interpreters are often unavailable" which has required these prisoners to "rely on untrained and uncertified fellow inmates as de facto interpreters." (Doc. # 76 at 26). Defendants, on the other hand, assert that "[t]he evidence simply does not bear out this allegation," and that "translation services are offered for all programming that is operated by[12] MDOC staff." (Doc. # 85 at 12). Before turning to the merits, the Court addresses two contradictions in the Defendants' arguments, each of which precludes entry of summary judgment in their favor.
First, the Defendants expressly "admit[ ] that before June of 2015, there were issues with the services provided by its translation services vendor[,]" Linguistica. (Doc. # 85 at 12). Nevertheless, they argue that the MDOC "addressed" any related "systemic problems ... before Plaintiffs filed the instant lawsuit," and that as a result, Defendants, not Plaintiffs, are entitled to summary judgment on this issue:
[Linguistica's] contract was terminated as a result of the problems [ ] [which] demonstrates that MDOC is responsive to the concerns of its hearing impaired prison population. As stated in Defendants' motion, translation services are offered for all programming that is operated by MDOC staff. Interpreter services are also provided for all healthcare visits, parole board hearings, parole violation hearings, during the prisoner discipline process, during all required programming, for all administrative hearings, during the grievance process, for any legal needs, during prisoner orientation, and during all educational programs. Thus, any systemic problems with interpreting services were addressed before Plaintiffs filed the instant lawsuit and have been resolved.
(Doc. # 85 at 12-13) (internal citations omitted).
But the evidence on which Defendants principally rely for this argument is a July *714 20, 2015 memo from the MDOC's Deputy Director, Kenneth T. McKee, to all MDOC wardens, informing them that effective July 1, 2015, the MDOC had cancelled the Linguistica contract, and that all "CFA facilities shall retain services via a purchase order (PO) for ... (as appropriate) (3) American Sign Language Services (ASL) ..." (DX 20) (the "McKee Memo"). The McKee Memo lists numerous such "settings," including during: healthcare visits; Parole Board hearings and proceedings; discipline proceedings; "required programming (for example, GED class, VPP programing, sex offender programing, etc.)"; administrative hearings; grievance proceedings; orientation meetings; and "[o]ther instances as the facility determine necessary." (Id. ). The problem with Defendants' argument is that Plaintiffs filed their complaint on March 31, 2015, a few months before McKee issued his memo. Thus, while the MDOC may have begun "addressing" these problems before Plaintiffs commenced this action, Defendants' own admission and evidence nullifies their argument that the McKee Memo entitles them to summary judgment.
A second contradiction in Defendants' argument is that whereas they seem to agree that the MDOC must provide interpreter services for deaf and hard of hearing inmates in connection with their health care visits (id. ), they simultaneously argue that the MDOC's failure to do so would not violate the ADA if the prisoner failed to "establish[ ] that she was not able to get necessary or effective medical treatment." (Doc. # 85 at 13). This argument lacks merit because it erroneously focuses on the outcome of any particular prisoner's health care visit when the MDOC's obligation under the law arises before , and in connection with , the visit; the MDOC must provide accommodations to deaf and hard of hearing prisoners sufficient to afford them "an equal opportunity to participate in , and enjoy the benefits of , a service, program, or activity" of a the MDOC's facilities. 28 C.F.R. § 35.130(b)(1) (emphasis added); see also id. § 35.160(a)(1) (requiring public entities to "take appropriate steps to ensure that communications with ... participants ... with disabilities are as effective as communications with others"). Indeed, the issue is particularly acute in the health care setting where the accurate communication of information between patient and medical provider during the visit can significantly impact the patient's health and well-being.
In short, a positive outcome in any particularly medical appointment does not necessarily mean that equal participation was offered or took place. See, also e.g. , Robertson v. Las Animas Cty. Sheriff's Dep't , 500 F.3d 1185, 1199 (10th Cir. 2007) (rejecting argument that deaf prisoner was not injured for purposes of ADA claim by exclusion from hearing, when charges were dropped, because he was "denied the ability to participate in his probable cause hearing to the same extent as non-disabled individuals").
Turning to the merits of the instant dispute, there principally are two separate issues in play. The first is whether Plaintiffs have shown sufficient evidence of interpreters not being present to assist deaf and hard of hearing inmates for "high-stakes" MDOC programs and services like medical appointments to merit the injunctive relief they seek. The second is whether, under the ADA, the MDOC must provide ASL interpreters for activities like religious services that are voluntary and are run by volunteers.
i. Provision of ASL Interpreters for "High Stakes" Programs and Services Other than Religious Services
Plaintiffs assert that "[t]here is no genuine dispute on the failure of MDOC to provide sufficient access to ASL interpreters" and that "the record is replete with *715 examples of interpreters not being present for high-stakes activities like medical appointments well after the lawsuit was filed, and after the Linguistica contract was cancelled." (Doc. # 89 at 8). Defendants disagree, and assert, "[w]ith the exception of one medical appointment scheduled for Plaintiff McBride, Plaintiffs have not presented evidence that they have been denied meaningful access to any program, service or activity as a result of a denial of translation services since the filing of the instant case.... They certainly have not demonstrated that there has been a systemic denial of interpreting services." (Doc. # 85 at 13-14). In their reply brief, Plaintiffs reiterate their position that, "the record is replete with examples of interpreters not being present for high-stakes activities like medical appointments well after the lawsuit was filed, and after the Linguistica contract was cancelled." (Doc. # 89 at 8). Plaintiffs then cite numerous exhibits that they contend support this assertion. (Id. ).
Although this issue presents a closer call factually than Plaintiffs' argument regarding telecommunications services, ultimately, Defendants have failed to raise a material question of fact that violations of the ADA have occurred, and that the injunctive relief sought by Plaintiffs is appropriate and necessary to ensure that future violations do not take place. The Court begins by recognizing that the MDOC has taken positive steps towards addressing the issues Plaintiffs complain about in this litigation. Prior to the commencement of this action, it is undisputed that the MDOC did not have guidelines for medically classifying prisoners with hearing deficits, and had no policies related to housing such prisoners at appropriately designated facilities, or to providing specific communications accommodations. See supra at 701-02. The MDOC also admits that Linguistica was failing to provide ASL interpreting services on a reliable basis. (Doc. # 74 at 18; DX 18; DX 22 at 3). Equally undisputed, however, is that since this lawsuit was filed, the MDOC has taken steps to address many of those issues, including through the McKee Memo discussed above, supra at 713-14. Thus, unlike the situation with the video communication technology, where the parties dispute whether the accommodation must be provided at all, the question here is one of degree.
Defendants are correct that the vast majority of the medical records Plaintiffs cited in their initial motion pre-dated the filing of the complaint in this matter, the McKee Memo, or both (e.g. , PX V, PX DD, PX EE, PX GG, PX II, PX MM, PX NN, PX OO, PX RR). And, while Plaintiffs thereafter supplied a handful of other more recent records which show deaf and hard of hearing inmates being unable to effectively participate in medical appointments that needed to be rescheduled because an interpreter was not present or not "available" (PX HH, PX JJ, PX PP, PX QQ, PX KKK, PX LLL), neither side provided a detailed quantitative analysis of the issue.
At the same time, Plaintiffs' post-litigation exhibits do document violations of the ADA, which, coupled with other more qualitative evidence before the Court, shows that absent appropriate injunctive relief, the MDOC's deaf and hard of hearing inmates face a very real risk of not timely receiving the accommodations they need to effectively communicate during "high stakes" interactions such as medical appointments. For instance, Defendants' "no harm, no foul" argument discussed supra at 714, at least gives the impression that they believe the obligations the ADA imposes on the MDOC are something less mandatory. So too, does the fact that, despite the prior problems, and the pendency of this litigation, the MDOC has not taken *716 any steps to monitor or verify whether its facilities are complying with the McKee Memo's directives.[13] (PX AA at 7-8). Perhaps, then it is not surprising that Plaintiffs have shown numerous post-litigation instances of deaf and hard of hearing prisoners having to reschedule medical appointments because no interpreter was present at the scheduled one.
In sum, the undisputed evidence is that (1) before this lawsuit was filed, the MDOC's deaf and hard of hearing prisoners' rights under the ADA were violated when they were not provided with ASL interpreters during high-stakes interactions such as health care visits, (2) since this lawsuit was commenced, some advancements have been made in that area, but as noted above, there still have been numerous instances since that time of these prisoners not receiving "effective" accommodations, such as when an inmate's medical appointment had to be rescheduled because no ASL interpreter was present at the appointed time,[14] and (3) absent Court-ordered injunctive relief, there remains a real risk that these ADA violations will continue. Accordingly, Plaintiffs are entitled to summary judgment on this aspect of their ADA and Rehabilitation Act claims. See Pierce , 128 F.Supp.3d at 275-76 ; Clarkson v. Coughlin , 898 F.Supp. 1019, 1038, 1048-49 (S.D.N.Y. 1995).
ii. Provision of ASL Interpreters for Religious Services
Plaintiffs also argue that under the ADA the MDOC must provide deaf and hard of hearing inmates with ASL interpreters during religious services that take place inside the prison. It is undisputed that the McKee Memo does not include religious services in its list of activities for which ASL interpreters must be provided, and that the MDOC does not provide ASL interpreters at religious services conduct at its prisons. (PX AA at 61; PX BB; PX K at 50). Indeed, the MDOC argues that the ADA does not require it to provide interpreters for religious services because "[s]uch services are led by volunteers and participation in voluntary." (Doc. # 74 at 29). As explained below, Plaintiffs are entitled to summary judgment on this issue.
Title II of the ADA mandates that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA also requires public entities to provide accommodations that allow disabled individuals to enjoy the same services provided to non-disabled persons. Pursuant to the Department of Justice's Regulation, 28 C.F.R. § 35.160(b)(1), "[a] public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity." The definition of auxiliary aids includes:
Qualified interpreters, note takers, transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open *717 and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments.
28 C.F.R. § 35.104(1).
The Court can easily dispense with Defendants' argument that the ADA does not apply to the situation at hand because religious services are "voluntary." In Pennsylvania Dep't of Corr. v. Yeskey , 524 U.S. 206, 211, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998), the U.S. Supreme Court specifically found that the ADA applied to programs, services, or activities that were "voluntary." See also Robertson v. Las Animas Cty. Sheriff's Dep't , 500 F.3d 1185, 1199 (10th Cir. 2007) (defendant's voluntariness argument "misses the point" of the ADA). Accordingly, the mere fact that attending religious services is voluntary, as opposed to mandatory, does not render Title II inapplicable.[15]
Nor is Title II inapplicable to religious services conducted inside MDOC prisons simply because the MDOC does not itself "lead" those services or employ the clergy who do. Defendants' argument seems to be that because the MDOC does not itself lead the religious services held inside the prison walls, such services are not services, programs, or activities "of a public entity," 42 U.S.C. § 12132, or "conducted by a public entity". 28 C.F.R. § 35.160(b)(1), and therefore, are not subject to the ADA. This argument lacks merit as it relies on too narrow an interpretation of the phrase "services, programs, or activities," as that phrase is used in the relevant statutes and regulations.
The Court begins with the fact that although Title II does not define "services, programs, or activities of a public entity," courts have defined that phrase with considerable breadth. The Sixth Circuit, for instance, has held that as used in the ADA, the phrase " 'programs, services, and activities,' include all of the activities of a public entity." See Johnson v. City of Saline , 151 F.3d 564, 570 (6th Cir. 1998). The Johnson court also explained, "our conclusion-that the discrimination forbidden by § 12132 must be with regard to services, programs, or activities-is for the most part a distinction without a difference. This is because we find that the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does ." Id. at 569 (emphasis added). The Sixth Circuit noted that "this broad reading of 'programs, services, and activities' is consistent with the broad definition used in § 504 of the Rehabilitation Act ('the term 'program or activity' means all of the operations'). 29 U.S.C. § 794(b). This is significant, because we look to the Rehabilitation Act for guidance in construing similar provisions in the Americans with Disabilities Act." Id. at 570 (citing, inter alia , McPherson v. Michigan High School Athletic Ass'n, Inc. , 119 F.3d 453, 459-60 (6th Cir. 1997) (en banc); House Report at 50 (1990), 1990 U.S.C.C.A.N. at 473 ("The Committee intends that title II work in the same manner as Section 504.") ).
Viewed against the above standards, it is clear that although the MDOC's officials do not serve as the clergy at the religious services, the ADA still applies. Here, the MDOC offers its prisoners a service-the opportunity to attend a religious service *718 inside the prison. See Yeskey , 524 U.S. at 211, 118 S.Ct. 1952 ("[t]he prison law library, for example, is a service (and the use of it an activity).)" Providing this opportunity is therefore part of the operations of the MDOC's prisons. It must therefore "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities ... an equal opportunity to participate in, and enjoy the benefits of" that service. 28 C.F.R. § 35.160(b)(1). Because the MDOC admits it does not do this with respect to religious services, summary judgment in Plaintiffs' favor on this issue is appropriate.
iii. Notification of Prison Warnings and Announcements
Plaintiffs also argue that the MDOC "has failed to ensure that deaf and hard of hearing prisoners are consistently notified of emergency and other announcements." (Doc. # 76 at 28). They note that 28 C.F.R. § 35.152(b)(3) provides that "[p]ublic entities shall implement reasonable policies ... so as to ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing." The MDOC claims it does exactly that. The Court finds a question of fact exists as to this issue.
Factually, Plaintiffs rely on the expert reports of Ray and Dr. Cokely. Ray writes:
From reviewing the photos of MDOC facilities that MDOC produced in this case and that I received, it appears that there is no visual alarm in the cells.... Deaf inmates may not be able to see the [common area] strobe light from their cells ... Also, the light may not be bright enough to be seen during daylight.
WHV lacks an effective system of notification lights or signs for notifying Ms. McBride and other deaf and hard-of-hearing inmates. WHV has a single, red notification light outside the officer's station at the facility's Gladwin Housing Unit B. This light is sometimes used to announce inmate "count time"-officers sometimes turn the light on when count starts and off when count is over. Ms. McBride cannot see the signs or the single, red notification light in her cell or in the television room.
WHV has issued pagers to approximately six deaf and hard-of-hearing inmates, including Ms. McBride, to help the facility notify these inmates of alarms and announcements. WHV apparently has used the pages sporadically; thus this communication system may not yet be effective.
(PX P at 23-24).
Similarly, Dr. Cokely writes:
Based on my tour of MDOC facilities, my review of documents and my interviews with [deaf] and hard of hearing inmates, I believe that MDOC has failed to provide visual alarms and/or signals, and that such failure poses significant risks for [deaf] and hard of hearing inmates. My tour of MDOC "designated" facilities for [deaf] and hard of hearing inmates (WHV, DRF and SRF), revealed no visual alarms and/or signals in any of the areas we were allowed to visit. Those areas included medical areas, inmate common areas and inmate cell areas. In none of these locations did I observe any sort of visual alarms or signaling device. If there are no visual alarms/signals in the "preferred" facilities, one can assume that the non-preferred facilities also have no visual alarms/signals. Indeed, MDOC personnel have admitted that they are not aware whether all facilities that house [deaf] and hard of hearing inmates have visual alarms/signals.
(PX Q at 42). Like Ray, Dr. Cokely also recognized that the MDOC "has installed a *719 page alert system which is designed to function as an alternative to a lighted message board or other visual signaling system," though he questions its efficacy in light of what he learned during interviews of unspecified "WHV inmates."
Defendants contest Plaintiffs' argument and evidence, and in so doing raise material questions of fact about this aspect of Plaintiffs' claims. For example, Defendants have presented evidence that the facilities designated to house hearing impaired prisoners "all have strobe lighting to notify prisoners in the event of a fire emergency." (DRX 3). They also argue that during Dr. Cokely's visit, "he did not ask for a demonstration of the emergency notification system and has no idea of how bright the lights are or the breadth of their warning capability." (Doc. # 85 at 15-16). To this end, the Court also notes that Ray's opinion was not very specific. (PX P at 23) (noting that prisoners "may not be able to see ..." and "the light may not be bright enough to be seen during daylight.") (emphasis added).
Defendants also note that the MDOC has implemented a "page alert system," which they contend Dr. Cokely "admitted ... is also an acceptable individualized messaging tool." (Doc. # 85 at 16). What Dr. Cokely actually said is that he had heard some complaints about the page alert system not functioning "reliably," but that if the "individual variables that could go wrong ... can be reliably controlled," the pagers "may be an acceptable alternative" to his recommended solution of a flashing light board. (DRX 2 at 6).
Taken together, there is at least a question of fact as to whether the technology utilized by the MDOC satisfies the requirements of 28 C.F.R. § 35.152(b)(3). Accordingly, summary judgment on this issue is not appropriate for either side.
iv. Training Related to Treatment and Accommodation of Deaf and Hard of Hearing Prisoners
Lastly, it is undisputed that while the MDOC offers training to its staff on a multitude of subjects related to the administration of prisons, it has no system-wide policy of educating and training prison staff on specifically how to appropriately identify, communicate, and interact with deaf and hard of hearing prisoners. (DRX 6; PX WW at 7-8). Plaintiffs correctly acknowledge that ADA guidance instructs that it is "appropriate for public entities to evaluate training efforts" because a lack of education will oftentimes lead to discriminatory practices. See Appendix B, 1991 Section-by-Section Analysis on 28 C.F.R. § 35.105, at 192 (PX III). Additionally, Dr. Cokely and Ray opine that the MDOC should implement and offer staff training on both the Rehabilitation Act and the ADA. (PX P at 29; PX Q at 35-36).
Defendants, in addition to pointing to the extensive training MDOC staff does receive, argues that "if there were systemic issues related to inadequate training those issues would have surfaced in the form of repeated grievances on the same or similar subjects. Plaintiff has not presented any evidence that such a pattern exists because that is simply not the case." (Doc. # 85 at 17). Plaintiffs respond, simply, "they have : MDOC ignores the myriad relevant complaints in the record." (Doc. # 89 at 10) (emphasis in original).
The Court has reviewed the handful of grievances cited by Plaintiffs, some of which pertain to the same prisoner, and they largely reflect the types of issues discussed herein. While many of those issues seem at least potentially intertwined with the absence of a formal training program like the one suggested by Plaintiffs, Plaintiffs have not shown entitlement to "summary judgment" on this point as an *720 independent basis for relief. Nevertheless, in light of all of the matters discussed herein, and assuming this Report and Recommendation is adopted, it would be an appropriate exercise of the Court's remedial powers and discretion to include in any Consent Order a provision requiring MDOC correctional officers and staff to receive some form of reasonable training on how to identify and appropriately interact with deaf and hard of hearing prisoners.
B. Defendants' Summary Judgment Motion Should be Denied
i. Plaintiffs' ADA and Section 504 Claims are Not Moot
For the reasons discussed above, the MDOC's post-litigation efforts to provide accommodations for deaf and hard of hearing prisoners do not moot Plaintiffs' ADA or Section 504 claims. Sixth Circuit law is clear that "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." E.g. , Unan v. Lyon , 853 F.3d 279, 288 (6th Cir. 2017). Rather, the party asserting mootness faces the "heavy burden" of making "absolutely clear" that the conduct giving rise to the suit "could not reasonably be expected to recur." See Trinity Lutheran Church of Columbia, Inc. v. Comer , --- U.S. ----, 137 S.Ct. 2012, 2019 n.1, 198 L.Ed.2d 551 (2017) ; A. Philip Randolph Inst. v. Husted , 838 F.3d 699, 712 (6th Cir. 2016) ; Heyer v. United States Bureau of Prisons , 849 F.3d 202, 219 (4th Cir. 2017) (rejecting BOP's claim of mootness in the context of hearing-impaired prisoner litigation).
In assessing the likelihood that a defendant will reinflict a given injury, the chain of potential events leading to recurrence need not "be air-tight or even probable" to justify a finding of non-mootness. Barry v. Lyon , 834 F.3d 706, 716 (6th Cir. 2016). Instead, it is enough if the controversy "possibly could" arise again. Id. (citing Honig v. Doe , 484 U.S. 305, 319 n.6, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) ). Although voluntary cessation by government officials is generally accorded more weight, e.g. , Ammex, Inc. v. Cox , 351 F.3d 697, 705 (6th Cir. 2003), greater skepticism is warranted where such remedial action "only appears to have occurred in response to the present litigation, which shows a greater likelihood that it could be resumed." Northland Family Planning Clinic, Inc. v. Cox , 487 F.3d 323, 342-43 (6th Cir. 2007).
Moreover, in the context of prison litigation, courts are particularly suspicious of non-binding policy changes by correctional institutions party to the litigation. See Akers v. McGinnis , 352 F.3d 1030, 1035 (6th Cir. 2003) (noting that because the policy directive fell "solely within the discretion of the MDOC, there is no guarantee that MDOC will not change back to its older, stricter Rule as soon as this action terminates"); Heyer , 849 F.3d at 219 (observing that "mid-litigation change of course" in accommodating deaf and hard of hearing prisoners does not moot ADA and Rehabilitation Act claims because "[b]ald assertions of a defendant-whether governmental or private-that it will not resume a challenged policy fail to satisfy any burden of showing that a claim is moot").
For all of the reasons discussed above, Defendants clearly do not satisfy this demanding burden, and their "mootness" argument fails.
ii. Defendants' Arguments for Summary Judgment as to Plaintiffs' RLUIPA and Constitutional Claims Lack Merit
Defendants contend they are entitled to judgment on Plaintiffs' RLUIPA and constitutional claims using virtually the exact same four pages of argument contained in their 2015 motion that was expressly considered and rejected by the undersigned *721 and the Honorable Sean F. Cox. (Docs. # 28, # 36). Plaintiffs pointed this out in their response brief, and attached Exhibit PPP which is a comparison of the salient portions of Defendants' two motions. (PX PPP). Defendants did not meaningfully address the matter in their reply brief.
Plaintiffs correctly argue that as to these claims, the Defendants have presented no new evidence or arguments that would compel the Court to reconsider its prior ruling. Accordingly the law of the case doctrine applies in these circumstances, and Defendants' request for summary judgment should be denied. See Howe v. City of Akron , 801 F.3d 718, 739 (6th Cir. 2015) ("courts should not reconsider a matter once resolved in a continuing proceeding.") (quoting 18B Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice And Procedure: Jurisdiction And Related Matters § 4478 (4th ed.2015) ).
IV. CONCLUSION
For the reasons stated above, the Court RECOMMENDS that Plaintiffs' Motion for Summary Judgment (Doc. # 76) be GRANTED IN PART AND DENIED IN PART , and that Defendants' Summary Judgment Motion (Doc. # 74) be DENIED . Further, the Court should:
1. Enter summary judgment in favor of Plaintiffs on Counts I and II of the complaint consistent with the foregoing analysis of their claims.
2. Mandate that the MDOC:
a. Make videophones available to all deaf and hard of hearing prisoners;
b. Provide necessary auxiliary aids for all deaf and hard of hearing prisoners to participate equally in prison programs and services, including consistent access to ASL interpreters for all "high-stakes" interactions and programs, see supra at 713, including religious services;
c. Institute mandatory training for MDOC's correctional officers and staff on how to identify and appropriately interact with deaf and hard of hearing prisoners;
d. Adopt effective and comprehensive policies and procedures in each of the above areas, including for appropriate compliance monitoring;
3. Require the parties to meet and confer in an attempt to resolve any aspects of Plaintiffs' claims not disposed of in this Report and Recommendation, and to agree on an appropriate consent order implementing the relief specified in Paragraph 2 above, and any other relief necessary to bring this action to a close.
4. Require the parties to either file the aforementioned proposed consent order for the Court's review and approval within 60 days of the Court's ruling on this Report and Recommendation, or to file by that same date a joint status report regarding any outstanding issues preventing the parties from agreeing on such a consent order.

Although the parties' summary judgment motions have been referred to the undersigned for a Report and Recommendation, this action is assigned to the Honorable Sean F. Cox, and ¶ (C)(2)(a) of his Motion Practice Guidelines specify "The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute." The Guidelines go on to specify additional requirements for that Statement. As was the case with their initial summary judgment motion, Defendants' instant summary judgment motion is not accompanied by the required Statement. Moreover, while Plaintiffs filed such a Statement in support of their instant summary judgment motion (Doc. # 78) ("Pl. SMF"), Defendants, again contrary to ¶ (C)(2)(b) of Judge Cox's Guidelines, failed to submit a Counter-Statement of Facts. In light of Judge Cox's prior admonition (Docs. # 36 at 2), Defendants' excuses for again failing to follow these requirements (Doc. # 88 at 4-5) are hardly worth further discussion. While Defendants' failure in this regard could warrant denying their summary judgment motion or deeming them to have admitted the facts asserted by Plaintiffs, such sanctions would be too harsh, particularly considering (1) that Defendants did clearly articulate in the body of their briefs the facts on which they rely, and (2) the importance of this case to both sides. In the future, however, Defendants should pay strict attention to judges' motion practice guidelines. Similarly, while Defendants should have sought permission to file a second motion for summary judgment, see E.D. Mich. LR 7.1(b)(2), again, the Court finds it would be too harsh to deny their instant motion on that basis. Moreover, as explained below, the salient facts are not in dispute; rather the parties dispute whether those facts establish violations of the law and the need for injunctive relief.

Another named plaintiff, Brian Wittman, was released on parole after this litigation began.

Plaintiffs' exhibits to their various summary judgment filings are identified by letter, seriatim, from A through KKKK. For ease, the Court will refer to these exhibits as "PX __." The exhibits to Defendants' summary judgment motion are numbered 1-26, and the Court will refer to these as "DX __." Defendants' exhibits filed in response to Plaintiffs' summary judgment motion are numbered 1-6. The Court will refer to these exhibits as "DRX ___."

Both sides agree that the laws in question require the MDOC to provide disabled persons "meaningful access" to the benefits of its services. (Doc. # 76 ("the ADA also requires affirmative steps to 'make reasonable accommodations for disabled individuals so as not to deprive them of meaningful access to the benefits of the services such entities provide.' ") (quoting Ability Ctr. of Greater Toledo v. City of Sandusky , 385 F.3d 901, 907 (6th Cir. 2004) ; Doc. # 74 ("Individuals are denied the opportunity to participate in or benefit from a defendant's services, programs, or activities, if they are denied 'meaningful access' to those services, programs or activities based on their disability.") (citing Alexander v. Choate , 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) ).

Defendants do not challenge this assertion, much less present evidence that it is inaccurate. Indeed, in a June 27, 2013 e-mail from Paul Slagter, the person designated by the MDOC as its 30(b)(6) witness with knowledge about, inter alia , communications devices and/or services for deaf and hard of hearing prisoners, to MDOC Office of Legal Affairs Administrator, Daphne Johnson, he wrote, "we are hearing locally from the prisoners ... that [TTY] is outdated and the family members and the community no longer have the machines. It would be comparable to sending someone a fax to their homes versus an email to communicate." (PX R; PX Y at 7).

Importantly, and contrary to what one might assume, Dr. Cokely explains, "There is no cost to the individual for using VRS other than the cost of internet connectivity. The Federal Communications Commission (FCC) established the Telecommunications Relay Fund to fund the costs of Telecommunication Relay Services (established under Title IV of the Americans with Disabilities Act). Funding comes from rate adjustments or surcharges on local telephone bills that are set annually by the FCC. Companies that offer [VRS] are paid from the TRS fund and those companies provide free Videophone equipment to [deaf] individuals and companies/entities with [deaf] employees." (PX Q at 51-52).

Defendants do not raise "cost" as a basis for declining to provide such technology. Yet, it is worth noting that Plaintiffs established, in part through internal MDOC memos and Slagter's testimony, that at least VRS can be made available at MDOC facilities at no cost. (PX K at 32-33; PX S at 4; PX P at 15-16). Moreover, the evidence before the Court establishes that videophones are readily available for implementation at MDOC facilities at essentially no cost to the MDOC (or the user, for that matter). (PX Q at 51).

In the analogous case of Pierce v. D.C. , 128 F.Supp.3d 250 (D.D.C. 2015), although the court ultimately found it unnecessary to rule on the issue, id. at 277, it did characterize TTY technology is "outmoded." Id. at 261. The very recent case of Heyer v. U.S. Bureau of Prisons , 849 F.3d 202 (4th Cir. 2017), although not involving the ADA, also sheds some light on this issue. At issue in that case was a Board of Prisons "ban on videophones." The Fourth Circuit wrote that "TTY is old technology that is fast becoming obsolete," and that "because a TTY device is required on both ends of the call, the abandonment of TTY technology means there are fewer and fewer people with whom [the plaintiff] can communicate." Heyer , 849 F.3d at 207. Although not in the context of an ADA claim, the Fourth Circuit "disagree[d]" that the Bureau of Prisons "ban on videophones is reasonable." Id. at 216.

This regulation was not directed specifically at prisons.

In fact, MDOC policy is that, except for a limited types of calls, such as between a prisoner and his attorney, "[a]ll telephone calls made from telephones designated for prisoner use shall be monitored ..." with "monitor" being defined as "[t]o listen to or record, or both." (PX BBBB). Thus, even if all telephone calls are not being followed in real time by a prison official, they are all subject to some form of monitoring.

Slagter identified three instances of "misuse," but none had anything to do with the video technology itself, and could just as easily have happened in a telephone call between hearing individuals. (PX S at 4) (e.g. , "One prisoner using VRS to call the girlfriend of another;" "One prisoner making abusive remarks to the called party.").

As discussed below, the Defendants take the position that religious services held inside MDOC prisons are voluntary activities, conducted by volunteers, and therefore, are not "programming operated by MDOC staff" that is subject to the ADA.

Furthermore, the McKee Memo is "not a policy directive," and at any rate, does not establish any specific procedures to ensure that interpreters are available for "high stakes" interactions, such as medical appointments and disciplinary hearings. Nor are such procedures part of any other formal MDOC policy. (PX K at 44).

See 28 C.F.R. § 35.160(b)(2) (In order to be "effective" "auxiliary aids and services must be provided in accessible formats [and] in a timely manner.").

Defendants cite Rothschild v. Grottenthaler , 907 F.2d 286, 293 (2nd Cir. 1990), arguing that court held that "requiring school district to provide sign-language interpreter for deaf parents of student at school-initiated conferences incident to student's education, but not at voluntary extra-curricular activities, was 'reasonable accommodation' ". (Doc. # 74 at 29-30). Rothschild , however, is no help to Defendants as that case was decided years before Yeskey .