Catherine C. Eagles, UNITED STATES DISTRICT JUDGE
Pursuant to Rule 65 of the Federal Rules of Civil Procedure, plaintiff Angela M. Beck has moved for a temporary restraining order and preliminary injunction against defendants to order the Federal Bureau of Prisons through its officers and employees in their official capacities to provide her with immediate urgent medical care to treat her breast cancer and to avoid the irreparable harm of the further spread of her disease and the potential loss of her life. The Court held hearings on the motion for temporary restraining order on May 15 and 17, 2019.
The Court has reviewed the complaint and the declarations of Dr. Karen M. Winkfield, Docs. 3-1, 13;[1] of Anne Holland, including the summary of medical records she prepared, Doc. 7; of Ms. Beck, Doc. 3-3; and of physician's assistant Captain Robin Hunter-Buskey. Doc. 12. The Court has further reviewed the brief filed by Ms. Beck, Doc. 4, and the medical records submitted at the May 15 hearing by the plaintiff *481 and by the individual defendants in their official capacities.
Based on the evidence, the Court finds that a limited temporary restraining order is appropriate to require the individual defendants in their official capacities, Patricia Bradley, warden of the prison where Ms. Beck is housed, and Hugh J. Hurwitz and J.A. Keller, Acting Director and Southeast Regional Director respectively of the Federal Bureau of Prisons, (1) to ensure Ms. Beck is delivered to her scheduled May consultation with a surgeon about the lumps in her right breast; (2) to ensure that appointments are immediately made for Ms. Beck to obtain an Oncotype Dx Test and to receive as soon as possible follow-up care from her medical oncologist and an appropriate evaluation for hormonal treatment; and (3) to quickly schedule any additional care or treatment ordered or recommended by her physicians as a result of these tests and appointments to take place as expeditiously as possible. In view of past delays by the Bureau of Prisons in scheduling such procedures, appointments, and tests, defendants shall inform and emphasize to the medical providers the need for urgent attention to Ms. Beck's condition and shall obtain the first available appointments. These defendants must show compliance no later than June 4, 2019.[2]
For purposes of resolving the motion for temporary restraining order, the Court FINDS the following facts:
1. At the May 15 hearing, hearing plaintiff's counsel confirmed he had given notice of that hearing to the U.S. Attorney; the Clerk's office also gave notice of the hearing to the Assistant U.S. Attorney handling a related issue in Ms. Beck's criminal case. See also Doc. 14. Assistant U.S. Attorney Joan Childs entered an appearance for the individual defendants in their official capacities before the May 15 hearing, Doc. 9, and appeared both at that hearing and at the May 17 hearing on their behalves. Counsel for Ms. Beck took reasonable steps to provide oral and written notice to the corporate defendant, Seven Corners, Inc. See Doc. 14. On May 15, summonses were issued to all defendants. Doc. 10. Service on some or all defendants may have been accomplished on May 16, see Doc. 14, but service has not yet been returned. Seven Corners did not appear at either hearing, nor did any individual defendant appear personally.
2. Plaintiff Angela M. Beck is in the custody and care of the United States Bureau of Prisons and is assigned to the Federal Correctional Institute (FCI) in Aliceville, Alabama. Doc. 3-3 at ¶ 1; Doc. 12 at ¶ 3. She has a family history of breast cancer, Doc. 3-3 at ¶ 3, and has been diagnosed with breast cancer, Stage II. Doc. 3-1 at ¶ 21.[3] She has no ability to schedule medical appointments on her own, nor would the defendants allow her to leave the FCI for any medical appointments the defendants did not arrange. She is completely dependent on the defendants to arrange for her medical care and treatment of her breast cancer. She has a serious medical need which has been diagnosed by a physician as mandating treatment and which, upon that diagnosis, is so obvious that even a lay person would recognize *482 the necessity for a specialist's immediate and continuing attention.
3. From the fall of 2017, when Ms. Beck discovered lumps in her left breast, Doc. 3-3 at ¶ 2, up to the present, BOP has repeatedly and continuously delayed scheduling necessary and urgent procedures, testing, examinations, and evaluations by qualified cancer specialists, in contravention to recommendations by treating medical care providers and risking the spread of Ms. Beck's cancer and endangering her life.
4. Specifically, after Ms. Beck saw the prison doctor to report lumps in her breast and he recommended imaging and consultation with a surgeon, 10/16/2017-Griffin [BOP 22], it took almost two months for Ms. Beck to see a surgeon. Doc. 3-1 at ¶ 19. When she finally saw a surgeon in early December 2017, he noted the "urgent" need for mammograms and ultrasounds, 12/06/2017-Gentry [BOP 33], but it took over two weeks for this to happen. Doc. 3-1 at ¶ 19. The imaging studies were "highly suggestive" of cancer, id. , but another eight (8) months elapsed before a biopsy was finally performed to test for cancer on August 28, 2018. Id. at ¶ 20. Over two (2) months elapsed between the biopsy, which confirmed malignant cancer, and her surgery to remove her left breast. Doc. 3-1 ¶ 21. Despite her surgeon's statement that she needed to see him one week post-surgery, 11/03/2018-Bilton, and an indication that the cancer had spread to her lymph nodes, Doc. 3-1 at ¶ 21, defendants failed to return her for a post-operative visit until six weeks had passed. Id. at ¶ 22. When she finally saw the surgeon again, he immediately told her that she needed an oncology follow-up, id. at ¶ 22, but defendants made no such appointment for her for months.
5. Specifically, five (5) months elapsed after her surgery and over three (3) months passed after her surgeon advised her to see an oncologist before she was taken to a medical oncologist to determine appropriate treatment and therapy to prevent the further spread of the malignant cancer. Id. at ¶¶ 22-23. Some seventeen (17) months elapsed between the time medical care providers at the prison learned about the lumps in Ms. Beck's left breast, see Doc. 3-1 at ¶ 18; Doc. 3-3 at ¶¶ 5-6, and the time she was permitted to consult with a medical oncologist. Doc. 3-1 at ¶ 23.
6. In the meantime, in January 2019, Ms. Beck discovered lumps in her right breast. Doc. 3-3 at ¶ 15. Initial evaluation suggests they may be benign, Doc. 3-1 at ¶ 22, but she has not yet been taken to consult with a surgeon. See Doc. 12 at ¶ 8.
7. When she finally saw a medical oncologist on April 3, 2019, the oncologist determined that it was too late to begin chemotherapy, which should be instituted soon after surgery. 04/03/2019-Evans [BOP 311]; see also Doc. 3-1 at ¶ 23. The oncologist ordered a BRCA genetic test and an Oncotype Dx test, both of which are used to assess risk of recurrence and evaluate treatment options, including hormonal/adjuvant therapy. 04/03/2019-Evans [BOP 311]; see also Doc. 3-1 at ¶ 28(b). Nothing in the medical records provided by defendants indicates that this test has been scheduled, much less performed. See Doc. 13 at ¶ 4. The medical oncologist also referred Ms. Beck to a radiation oncologist. 04/03/2019-Evans [BOP 311]. She was not taken to a radiation oncologist for about a month. 05/03/2019-Crew [BOP 317]. The radiation oncologist noted that it was now also too late post-surgery to begin radiotherapy, which would have been appropriate post-operatively. 05/03/2019-Crew [BOP 318]; Doc. 13 at ¶ 3. He recommended follow-up with the medical oncologist and suggested genetic testing, *483 05/03/2019-Crew [BOP 318], as had the medical oncologist a month earlier. See 04/03/2019-Evans [BOP 311].
8. The record is silent as to whether Ms. Beck has a follow-up appointment with her medical oncologist, as recommended by both the medical and radiation oncologists. According to a physician's assistant who regularly treats Ms. Beck in the prison, an appointment has been scheduled for a date certain in May with a surgeon. Doc. 12 ¶ 8, as recommended by the radiation oncologist in early May. See 05/03/2019-Crew [BOP 318].
9. According to Dr. Karen Winkfield, an experienced and well-qualified radiation oncologist at Wake Forest Baptist Comprehensive Cancer Center who has reviewed Ms. Beck's medical records, there is no medical justification for these delays, which constitute a substantial and gross violation of the standard of care for the treatment of breast cancer. See Doc. 3-1 at ¶¶ 1-7, 20, 23. Dr. Winkfield also affirms that the delays in treatment more likely than not put Ms. Beck at unnecessary risk for the spread of her disease. Id. at ¶ 24. Her opinions are credible and supported by Ms. Beck's testimony and the medical records provided. They are also consistent with what all of Ms. Beck's non-BOP physicians have been recommending and with what almost any lay person in the United States knows: breast cancer can kill and requires immediate and prompt treatment, medical attention, and follow-up care.
10. The individual defendants are Hugh J. Hurwitz, acting director of the Federal Bureau of Prisons; J.A. Keller, Southeast Regional Director of the Federal Bureau of Prisons; Patricia V. Bradley, Warden of the Federal Correctional Institute in Aliceville, Alabama; and John Doe and Jane Doe, unidentified present and former officers, agents, and/or employees of the Federal Correctional Institute in Aliceville. In their official capacities, Defendants Hurwitz, Keller, and Bradley have actual subjective knowledge of Ms. Beck's serious medical condition and the excessive risk posed to her if they fail to promptly schedule recommended medical treatment.
11. Ms. Beck has twice written to the warden, defendant Bradley, about the delays in her treatment, to no effect. Doc. 3-3 ¶ 13. Indeed, another prison administrator chastised Ms. Beck for going "over her head" and complaining to the warden about inadequate medical care, id. ¶ 14, confirming the warden's knowledge. Ms. Beck's medical condition was extensively documented in Bureau of Prisons medical records and prison officials arranged transportation for several appointments related to Ms. Beck's cancer treatments. See, e.g. , Doc. 3-1 at ¶¶ 18-23. It is implausible that the warden was not aware of Ms. Beck's diagnosis, and thus, her need for prompt treatment.
12. In January 2019, Ms. Beck filed a motion for compassionate release pursuant to the First Step Act and served Kenneth P. Hyle, the Acting Assistant Director and General Counsel of the Federal Bureau of Prisons. 13cr186-6, Doc. 494. In her motion, she laid out the delays in her medical treatment to date and clearly stated that BOP was not providing timely treatment for her breast cancer. Id. With Ms. Beck's consent, the Government's motion to stay was granted so Ms. Beck could exhaust her administrative remedies. Doc. 511. Ms. Beck's prison medical records confirm and contain full information about her unmet needs for treatment and the delays in treatment and follow-up, and those records are available to the individual defendants to examine in considering the request for compassionate release. The long-standing risk of serious harm to Ms. Beck as reflected in her prison medical records, the *484 compassionate release litigation and the novelty of that new process, and the associated BOP administrative process provide circumstantial evidence that defendants Hurwitz and Keller, in their official capacities, also had and have actual knowledge of the serious health risks Ms. Beck has been and is facing.[4]
13. While counsel for the individual defendants has identified one possible reason for a delay in one procedure, the record otherwise provides no reasons for the delays in arranging prompt treatment for Ms. Beck. The medical records provided show that health services staff at the prison usually have medical notes and recommendations from third-party medical providers within a few days,[5] and to the extent such timely exchange of information does not normally occur, they have not explained why it cannot occur more expeditiously in urgent cases where time is of the essence. Because of the defendants' delays in obtaining treatment for her, Ms. Beck has already been deprived of access to the radiation therapy and chemotherapy often appropriate after surgery to reduce the risk of tumor relapse. Doc. 3-1 ¶ 16. As a result, the need for testing and evaluation of hormonal/adjuvant treatment is urgent. Doc. 13 at ¶ 5.
14. There is nothing to indicate that the defendants will be harmed should a limited temporary restraining order be entered.
Based on the above, the Court concludes as a matter of law for purposes of this motion as follows:
1. The individual defendants Hurwitz, Keller, and Bradley, in their official capacities, received through counsel oral notice of the motion for a TRO and the May 15, 2019, hearing and through counsel received in-court notice of the May 17, 2019, hearing. See Fed. R. Civ. P. 65(b)(1) ; see also Doc. 14 at 1-2. Adequate notice has been given under Federal Rule of Civil Procedure 65(b).
2. Ms. Beck is entitled to injunctive relief because (1) she is likely to succeed on the merits of her Eighth Amendment claim; (2) she is likely to suffer irreparable harm absent preliminary relief; (3) the balance of the equities weighs in her favor; and (4) the injunction is in the public interest. See Patel v. Moron , 897 F.Supp.2d 389, 395 (E.D.N.C. 2012) (citing, e.g., Winter v. NRDC, Inc. , 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) ).
3. Specifically, based on Ms. Beck's evidence, there is a substantial likelihood that she has serious and urgent medical needs; that the defendants' failures to provide prompt and effective medical treatment for her cancer constitutes deliberate indifference in violation of their responsibilities under the Eighth Amendment to the United States Constitution, see, e.g., Heyer v. U.S. Bureau of Prisons , 849 F.3d 202, 209-10 (4th Cir. 2017) ; and that, in the absence of temporary injunctive *485 relief by this Court, Ms. Beck is likely to suffer irreparable harm in that further delays may result in the spread of her cancer and potentially in the further deterioration of her condition and/or death. See Doc. 3-1 ¶ 26 (testimony by Dr. Winkfield that delays in adjuvant therapy "compromise both recurrence free survival and overall survival").
4. The balance of equities tips in Ms. Beck's favor. The defendants have no medical justification for refusing and delaying Ms. Beck's urgent need for medical care, specifically evaluation of the lumps in her right breast and adjuvant therapy post-surgery on her left breast. The defendants have not identified any harm to them resulting from the entry of a temporary restraining order pending a hearing on the motion for a preliminary injunction.
5. Finally, a temporary restraining order is in the public interest because the relief sought would further the goals of upholding the constitutional rights of incarcerated persons to receive adequate and essential medical care while in prison.
6. Consistent with the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(2), the relief ordered in this injunction is narrow and is focused on requiring the defendants to obtain immediate appointments for Ms. Beck to obtain the specific treatment already ordered and directed by her treating physicians: an Oncotype Dx test, an appointment with her medical oncologist, and an appointment with a surgeon, as well as obtaining prompt attention to any follow-up care ordered by her treating physicians as a result of the test and the appointments.
7. There is no proof of likelihood of harm to the individual defendants in their official capacities, should it be determined later that this injunction was wrongfully granted. At neither hearing did counsel for the individual defendants ask for a bond or otherwise indicate that a bond was necessary or appropriate. The requirement for security, Fed. R. Civ. P. 65(c), is waived in the Court's discretion.
It is ORDERED that the plaintiff's motion for temporary restraining order, Doc. 3, is GRANTED .
It is FURTHER ORDERED that, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, pending the hearing and disposition of Ms. Beck's motion for preliminary injunction, the defendants Hurwitz, Keller, and Bradley, in their official capacities, are hereby temporarily restrained and enjoined to provide immediate medical care and treatment to the plaintiff, Angela Beck, as follows:
1. No later than May 22, 2019, Defendants Hurwitz, Keller, and Bradley shall ensure that the first available appointment has been made for Ms. Beck:
a. to obtain the Oncotype Dx test; and
b. with her medical oncologist, Dr. Evans, for follow-up care generally and for evaluation of whether hormonal treatment is appropriate.
2. In making these appointments, defendants Hurwitz, Keller, and Bradley shall insure that Bureau of Prisons and outside schedulers are aware of the urgency of Ms. Beck's situation so that the Oncotype Dx test can occur as quickly as possible and her appointment with Dr. Evans can occur as quickly thereafter as possible.
3. Defendants Hurwitz, Keller, and Bradley shall ensure that Ms. Beck is delivered to her existing May appointment with her surgeon.
4. Within 72 hours of any test or medical appointment, Defendants Hurwitz, Keller, and Bradley shall ensure that any follow-up tests, procedures, treatment, or appointments ordered or recommended by *486 the treating physician are scheduled or implemented.
5. This Court shall retain jurisdiction to monitor the defendants' compliance with this Order or amend the Order in the interest of justice.
6. No later than June 4, 2019, defendants Hurwitz, Keller, and Bradley shall file declarations under penalty of perjury showing, in detail, compliance with this order. Each shall also file under seal a declaration providing the date, time, and treatment provider scheduled for each future appointment.
7. This order expires fourteen days from entry.
8. A hearing will be conducted on plaintiff's motion for preliminary injunction on June 5, 2019, at 2:30 p.m. in Courtroom #3, L. Richardson Preyer Federal Courthouse, 324 W. Market St., Greensboro, North Carolina.
9. Plaintiff's counsel shall immediately arrange for personal service of this Amended Order on all of the defendants, as required by Federal Rule of Civil Procedure 65(d)(2).
10. The requirement for security, Fed. R. Civ. P. 65(c), is waived in the Court's discretion.

Unless otherwise specified, all docket citations are to this civil case. Citations to medical records contained in exhibits filed at the May 15 hearing will be to the date of the appointment and provider name, with the bates pagination in brackets. Citations to documents filed on the docket of Ms. Beck's criminal case, United States v. Beck , 13cr186-6 (M.D.N.C.), will be cited as "13cr186-6, Doc. #."

To the extent the declarations showing compliance disclose information about specific dates and locations of future medical treatment, this information may be filed under seal due to reasonable security concerns expressed by the Bureau of Prisons. See Doc. 12 ¶ 8.

For simplicity here and elsewhere, the Court cites Dr. Winkfield's declaration for many facts relevant to Ms. Beck's treatment history, but the Court did confirm the treatment history by reviewing the underlying medical records.

A plaintiff may circumstantially establish actual knowledge "from the very fact that the risk was obvious." Makdessi v. Fields , 789 F.3d 126, 133 (4th Cir. 2015). Actual knowledge may also be established from a showing "that a substantial risk of serious harm was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." Parrish ex rel. Lee v. Cleveland , 372 F.3d 294, 303 (4th Cir. 2004) (quoting Farmer v. Brennan , 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal quotations omitted)).

There is testimony from a physician's assistant who treats Ms. Beck that this exchange of information "generally" can take "up to one week," but a review of the records shows that it usually occurs more quickly.